681 So.2d 320 (1996)
STATE of Louisiana
v.
James E. DIVERS.
No. 94-KA-0756.
Supreme Court of Louisiana.
September 5, 1996.
Rehearing Denied October 11, 1996.
*321 R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Madeline M. Slaughter, Monroe, Charles L. Cook, West Monroe, for Respondent.
JOHNSON, Justice.[*]
On July 6, 1988, a grand jury in Ouachita Parish indicted James E. Divers for two counts of first degree murder, in violation of R.S. 14:30. On July 26, 1991, following a jury trail, the defendant was found guilty as charged on both counts. The jury then recommended the death penalty, having found two statutory aggravating circumstances, namely: (1) the offender was engaged in the perpetration or attempted perpetration of armed robbery, and first degree robbery; and (2) the offender knowingly created a risk of death or great bodily harm to more than one person. La.C.Cr.P. art. 905.4.
On direct appeal to this court under La. Const. Art. 5, § 5(D), the defendant assigns 95 assignments of error of which 61 were briefed. Finding merit in his argument that certain jurors should have been excused for cause but were not, we reverse the conviction and sentence, and remand this case for a new trial.

FACTS
On April 12, 1988, two college students reported to the police that, while walking for exercise at the Moon Lake recreational area in Monroe, Louisiana, they came across what appeared to be two dead bodies. The authorities arrived and discovered two bound and gagged black men: Winston Vandervield,[1] who was dead, and Simmie Lee Stevenson, who was unconscious. Each man had been shot once in the head with a small caliber weapon. Vandervield's mouth was taped shut with duct tape and his ankles and wrists were bound with men's neckties. His sweatpants were pulled down around his ankles and his underpants were pulled low, exposing his pubic hair. Stevenson was gagged with a piece of cloth and some men's neckties. His wrists were bound with a length of electrical cord and more neckties. Vandervield did not appear to have been injured in any other way, but Stevenson had several small lacerations on his face. Stevenson was transported to a local hospital where he died as a result of his injuries.
Stevenson's car, a 1983 maroon Chevrolet Monte Carlo, was found in nearby Sterlington, Louisiana,[2] and was seized by the police. Blood and pillows covered in blood were found in the Monte Carlo's trunk and blood was found in the car's back seat. In addition, a piece of electrical cord like the one used to tie Stevenson's wrists was found in the trunk. Stains made by the victims' blood were also found on the carpet of Vandervield's house at 1403 Mississippi Street in Monroe. Because there was blood in the house and car, it appeared to the police that at least one, if not both of the victims had been shot at the house. However, the police left open the possibility that one of the victims was shot at the Moon Lake location. "The Moon Lake Murders" as they were dubbed by the press at the time, generated a fair amount of publicity, although it was noted by some reports that this was not the first time that the Moon Lake recreational area *322 had been used as "a dumping ground for bodies."
The police got its first break in the case about a month after the bodies were found. The Dallas police reported that they had located Winston Vandervield's 1988 white Dodge Shadow, which had been missing since the night of the murders. The person who had been seen driving the car was the defendant, who was then apprehended and questioned by the police. The defendant gave his name as "Jessie Divers," and claimed he had gotten the car in Dallas by trading some addicts about $250 worth of cocaine for it. A check of police records provided information which confirmed that the defendant's first name was James, not Jessie. Jessie was the name of defendant's brother. Divers maintained that he had not been in Monroe since February, 1988 and that he had never met Vandervield or been to his house. However, Divers' fingerprints were found on several items in Vandervield's house.
A few days after Divers was arrested in Texas, his cousin, Everett Tyronne English, was arrested in Monroe in connection with the "Moon Lake Murders." English confessed to having been involved in the events leading up to the deaths of Vandervield and Stevenson and gave several statements, including a recorded statement. In this statement, English portrayed Divers as the ringleader and himself as a hapless youth who unwittingly found himself in the wrong place at the wrong time, however he refused to testify against Divers and his statements were ruled inadmissible. Divers was then confronted by the police with the fingerprint evidence linking him to Vandervield's house and with English's statements, but Divers still refused to make an inculpatory statement.
However, two of Divers' cellmates came forward to claim that Divers had confessed to them. Their testimony was given pursuant to a Motion To Perpetuate testimony. There was no indication that the two informants knew each other or were working in concert. One of them, Joel B. Thompkins, had been in a "tank" with the defendant in a Dallas jail, whereas the other, Donald Jack Elledge, had been housed with him in the Monroe jail. Each informant approached the authorities individually and each gave similar, although not identical, information which they claimed had been provided to them by Divers. Both claimed that Divers had admitted to them that he killed the two men found at Moon Lake.
On March 4, 1991, Thompkins testified that Divers had bragged to him that he "killed two homosexuals in Louisiana but got caught in Dallas because he had the car." He claimed that Divers had been "pimping punk",[3] however, he said that Divers' real motive for going to Vandervield's house on the night in question was to commit a robbery. He went on to say that Divers's cousin had voluntarily participated in the robbery, but that he "just flipped on [Divers]" when the violence started. Divers claimed that his cousin urged him not to kill the victims, prompting Divers to want to kill his cousin as well. Thompkins also claimed that when Divers learned that his cousin had made a statement to the authorities, Divers said he was going to make it look like his cousin did it.
Subsequently, on April 2, 1991, Elledge testified that Divers first approached him to ask for assistance with his case.[4] Elledge said that Divers then told him that he (Divers) had pulled the trigger on both victims. Divers told Elledge that he killed these men because he had been having a homosexual relationship with one of them and when Divers discovered that Vandervield was HIV positive he became concerned that others would find out about it. He further stated that Divers also told him that he killed the men and disposed of their bodies in the way he did to make it look as if their deaths had been incidental to a robbery. Elledge said that Divers' cousin had been a willing participant in the robbery, but that the cousin had turned Divers in for the murders, making a lengthy statement against him. Elledge *323 also said that Divers told him about a plea bargain he had been offered.

Trial Proceedings
During trial, voir dire was conducted over several days. The judge did not deny the defendant's change of venue motion until a jury had been selected. The judge opted not to conduct individual voir dire, but questioned the jurors in panels of four to contain the risk of taint from any prejudicial comments. Both the State and the defendant challenged many prospective jurors for cause.
The State employed a "check one of the above" approach, arguing to the jury that the defendant was guilty of two counts of first degree murder because he intentionally killed two people either: (1) during the commission of an enumerated felony, such as armed robbery, first degree robbery, simple robbery, aggravated kidnapping, or second degree kidnapping, or (2) with the specific intent to kill or inflict harm on more than one person.
The defendant presented an alibi defense through the testimony of two witnesses who claimed that, although the defendant was in fact in Monroe on the night in question (contrary to what he told the Dallas police), he spent the entire evening attending a barbecue and chaperoning a 14-year old family friend. The prosecution presented no rebuttal. The jury deliberated for one hour and 18 minutes before returning guilty verdicts on both counts of first degree murder.
Twenty minutes after the jury returned its verdicts in the guilt phase, the trial court commenced the penalty phase. The prosecution introduced the testimony of one witness, a Los Angeles police officer who arrested the defendant on prior felony charges and submitted the testimony and evidence presented in the guilt phase. Divers took the stand and stated that, although he had once been addicted to PCP, he had never sold the drug and had not used it since 1986. The defendant's mother and aunt (Mary English, the co-defendant's mother) both testified in his behalf. The final defense witness was Dr. Doyle Preston Smith, a specialist in addiction medicine, who testified to the effects of longterm narcotics addiction. The sole rebuttal witness was Linda Jones, a former girlfriend of the defendant, who disputed the defendant's testimony that he never dealt PCP.
The jury deliberated for two hours and 15 minutes before returning its recommendation that the defendant be sentenced to death. Although the defendant was convicted of two counts of first degree murder, the state asked for a single verdict and the jury returned only one penalty phase verdict.
After the jury filled out written polling slips, confirming its verdict, the jurors were released. Shortly thereafter, it was discovered that one juror had checked both "life imprisonment" and "death penalty" on her polling slip. This juror was contacted by telephone and she stated that this was an inadvertent mistake and that her vote was for death. She executed an affidavit containing this version of events. At a hearing held over a month after the trial, she testified consistently that she had mistakenly checked both boxes although she only meant to check death. Her explanation for her error was that she was distracted because she was helping an elderly juror fill out his polling slip. The trial court accepted her testimony and denied the motion. On September 12, 1991, the judge sentenced the defendant to death by lethal injection.

DISCUSSION
In his first two assignments of error, relator states that the trial judge erred by refusing to grant his cause challenges to prospective jurors. He argued that venirepersons Pritchard and Honea both expressed the belief that all "deliberate" or "intentional" killings should automatically be punished by death, therefore his denials for cause challenges constituted reversible error.
Our jurisprudence states that prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Maxie, 653 So.2d 526, 534 (La.1995); State v. Robertson, 630 So.2d 1278, 1280-81 (La.1994); State v. Ross, *324 623 So.2d 643, 644 (La.1993); State v. Bourque, 622 So.2d 198, 225 (La.1993); State v. Lee, 559 So.2d 1310, 1317 (La.1990); State v. Brown, 496 So.2d 261, 263-64 (La.1986). Also, Maxie, supra, states that in order to prove the presence of reversible error warranting reversal of both the conviction and sentence, the defendant need only show the following: (1) erroneous denial of a challenge for cause; and (2) use of all of his peremptory challenges. Here, the record shows that Divers exhausted all of his peremptory challenges, therefore our efforts will focus on whether or not defendant's challenges for cause of certain prospective jurors were erroneously denied.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-852 (1985); State v. Sullivan, 596 So.2d 177 (La. 1992), rev'd on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under La.C.Cr.P. art. 798(2)(a), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him...." In a "reverse-Witherspoon" context, the basis of exclusion is that the juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him...." State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1284.[5] If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).

Venire member Michael Pritchard
Pritchard was unsuccessfully challenged for cause by the defendant on three separate occasions. The first challenge related to the venue issue and the risk of taint from a fellow panel member's comments. Pritchard recalled reading and hearing about the Moon Lake murders in 1988, but didn't remember much and didn't follow the case. However, he heard fellow panel member Cheryl Newton state that she had discussed the case with her ex-husband, a private investigator while he was working on the case and that these discussions led her to form the opinion that Divers was guilty. Ms. Newton then said that it would be hard for her to be fair because "I think I know more than what was in the paper." After Ms. Newton made these comments, the other panel members were asked whether what they heard had affected them. Pritchard replied, "Well, I don't think it helps to hear what I just heard, but I don't know what she knows." The defense attorney asked Pritchard whether what he heard might influence his deliberations and he responded, "I can't tell you that they wouldn't enter my mind. As far as influence my decision I don't think it would but I can't guarantee you that, no."[6]
The defendant's cause challenge to Pritchard on the basis of the harmful effects of Newton's comments was denied. When *325 asked about his ability or intention to do certain things, Pritchard frequently equivocated or qualified his answer. For example, when the prosecutor asked him whether he would automatically recommend death if he found the defendant guilty or he would consider everything, Pritchard responded, "I would hope I would consider the circumstances involved."
The fundamental problem with Pritchard was his disagreement with the law on penalties for murder. He felt that both first degree and second degree murder should carry the death penalty. He stated that, in his view, "if it's premeditated whether it's in the act of a robbery or all of the other things that you listed (elements of first and second degree murder), the death penalty should go along with it." The defense attorney asked him if he would be able to leave his personal views aside, and Pritchard expressed doubt that he would be able to do so. The defense attorney then tried to ascertain the implications of Pritchard's views, asking "[Y]ou're not certain that you would be able to follow that law because you disagree with it?" Pritchard responded by equivocating, saying, "All I can say is I think I would. But, no, I can't guarantee you that."
The following colloquy then occurred:
Q (by the defense attorney): .... Now, what I'm wanting to know, sir, from you is, you've already made a decision guilty of first degree murder under the facts I've given you. Okay? Now, are you simply going to seat (sic) here and go through this process as things are presented to you basically, you know, go through the motions and just wait to vote for the death penalty because you've already voted guilty?
A (by Mr. Pritchard): Sounds like what I'm saying. If I believe .. believe that something is first degree murder and it's premeditated, and I've got my opinion that the death penalty should go along with it, I can't help what the law says. That if there were mitigating circumstances or not.. I mean I'd like to say that I would ignore it, my feelings about it, but I couldn't tell you that.
In an attempt to rehabilitate Pritchard, the prosecutor then tried to spell out the differences between first degree and second degree murder. She then asked him whether he would look for a way to convict the defendant of first degree murder so he could recommend the death penalty "... or are you going to be able to do what the law requires a juror to do in a case like this, to consider the options ..." Pritchard answered, "Well, I hope I would. I hope I would not go fishing for some excuse to come up with first degree (murder)." The following exchange then occurred:
Q (by the prosecutor): You consider yourself a trigger happy person or something or somebody ...
A (by Mr. Pritchard): Trigger happy?
Q: You know, somebody who thinks that you have to automatically give somebody the death penalty?
A: As I've said before, to me when it's premeditated they should carry the death penalty. But, as I said, that's an option.
Q: That's an option.
A: That's all it is.
Q: All right. And are you going to take your opinion and say, "That's my opinion, but when the judge reads me the law" .. because the judge is going to give you the law. Are you going to be able to say, "When the judge gives me the law I'm going to apply that law and I'm not going to apply Pritchard's law"?
A: I sure hope I'm going to. But, I know he's going to ask me can you guarantee me that....
Q: Well, I don't know if anybody's going to ask you to....
A: No. I can't guarantee anything.
Pritchard's stubborn refusal to "guarantee" or commit to his ability to follow the law provided a solid basis for a cause challenge. This was particularly problematic because he refused to state that he would accept the law as provided by the court concerning the imposition of penalties. Moreover, Pritchard was clearly predisposed to vote for the death penalty in any "premeditated" murder case, even a case which was a second degree murder.
Furthermore, Pritchard refused to state definitively that he would put aside this *326 "opinion" in order to serve as a juror. His answers were substantially worse than those of the juror in Ross, therefore, if the juror in Ross was unfit to serve on the basis of his responses, Pritchard's answers absolutely rendered him unfit.
Clearly, Pritchard was not only unable to follow the law, he was also unable to serve impartially. The defendant's cause challenge should have been granted on this basis. La. C.Cr.P. art. 797 §§ (2), (4).[7]

Venire member Marie Honea
Marie Honea reported for jury service having never set foot in a courtroom before. Her lack of knowledge of legal concepts was apparent from her first comments on the death penalty: "If he is found guilty ... of killing whoever was killed, was it one, two or four, whoever was killed, then I would say he'd get the death penalty." She then stated that she believed that the death penalty was for guilty people and life imprisonment was for people who were not found guilty but the prosecutor's explanations seemed to clear up some of her misunderstandings.
The defense attorney then questioned her about the death penalty and discovered that she believed that the only penalty for intentional murder, regardless of mitigation, was death:
Q (by the defense attorney): Okay. All right. If you thought somebody was guilty of murder what would be your decision about their punishment?
A (by Mrs. Honea): If they murdered the person and meant to murder them, you know, that was there (sic) intent to murder them, I say capital punishment.
Q: Yes, ma'am.
A: But, if it was different reasons then it would come into this other deal you was talking about. It would come into what... like when you come over here you find maybe ... maybe he had a reason. Maybe this person was going to kill him. See?
Q: Yes, ma'am. Now,....
A: So, ...
Q: .. You understand if the person was going to kill him and he could prove that, that would be like self-defense?
A: Yes.
Q: All right.
A: So, it wouldn't be murder.. Well, I.. I really don't see ...
Q: Well, I'm not ...
A: All I believe in, if you kill somebody... I believe in capital punishment. That's all I believe in. If you deliberately kill somebody.
Mrs. Honea kept raising the issue of selfdefense, which she seemed to believe was the only thing which could "mitigate" a murder. She appeared utterly unable to comprehend the distinction between a defense in the guilt phase and a mitigating factor in the penalty phase. Insofar as she was able to consider what she might do if no mitigation evidence was produced in the penalty phase, she stood by her view that intentional murders should always be punished by death:
Q (by the defense attorney): What if you didn't hear anything (in mitigation), ma'am?
A (by Mrs. Honea): Well, I'd still be like I was over (in the guilt phase).
Q: If you didn't hear anything about a good reason....
A: Yeah.
Q: .. then it's death penalty?
A: Yes.
Q: And you wouldn't consider life? You have to answer out loud.
A: No, I wouldn't consider life.
Shortly thereafter, the judge addressed the jury and read to them articles 905.2 and 905.3 of the Code of Criminal Procedure, *327 concerning sentencing hearings and jury findings for death sentences. He then asked each juror in turn whether he or she could accept the law as he would give it and his instructions. Mrs. Honea answered "Yes" when it was her turn. This was the extent of the rehabilitation on this issue. The judge then denied the defendant's cause challenge to Mrs. Honea and the voir dire proceeded. At the close of the voir dire of this panel, the defense challenged this prospective juror for cause based on her death penalty views and her inability to follow the law as to the presumption of innocence, and again the challenge was denied.
Defendant's cause challenge to Mrs. Honea should have been granted. Mrs. Honea clearly stated that in a case of "intentional murder" she would only consider the death penalty and would not consider life imprisonment. No individual rehabilitation was attempted by the prosecutor, nor did Mrs. Honea specifically abandon this view. She merely made a single general affirmation of her ability to follow the law when asked to do so en masse with her fellow panel members. On the whole, her responses consistently demonstrated her inability to set aside her views and be impartial on the issue of punishment.
Because of their responses during voir dire, and because of the inadequate rehabilitation of these jurors, the court's refusal to grant the cause challenges to Pritchard and Honea constituted reversible error. See Ross, at 644 where the trial court committed reversible error by failing to excuse a juror whose "personal opinion" was that the death penalty should be the only penalty for first degree murder, even though the juror claimed that he could consider both penalties.

DECREE
For the reasons assigned, defendant's conviction and sentence are reversed, we pretermit discussion of defendant's other assignments of error and remand this case to the district court for a new trial.
REVERSED; CONVICTION VACATED; REMANDED.
BLEICH, J., dissents; the trial judge did not commit error; written reasons assigned.
WATSON, J., dissents; see reasons assigned in State v. Maxie.
VICTORY, J., concurs in the result.
BLEICH, Justice, dissenting.
The conviction in this case was legally supported by the record and the sound judgment of the trial court, particularly during the voir dire process. The majority opinion inappropriately emphasizes excerpts of the voir dire of two prospective jurors rather than the totality of their testimony. The majority does not give appropriate legal deference to the trial court's discretion. Therefore, I respectfully dissent.
The majority has held that in a capital case, a juror who would choose to recommend the death penalty rather than life imprisonment when no mitigating circumstances are presented must be disqualified. I do not believe that the prospective juror[1] Honea should have been excused for cause. A careful examination of the testimony of prospective juror Pritchard leads to the same conclusion.[2]
*328 A juror should be dismissed based on mind-set and beliefs, first, if he "is not impartial, whatever the cause of his partiality." La.C.Cr.P. Art. 797(2). Second, a juror should be dismissed if he "will not accept the law as given to him by the court." La. C.Cr.P. Art. 797(4). The law relevant to capital sentencing mandates that "[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed." La.C.Cr.P. Art. 905.3. However, in the hypothetical questions posed to these jurors, there were no mitigating circumstances to be considered.[3] The jurors were not refusing to abide by the law.
The majority cite State v. Ross, 623 So.2d 643 (La.1993), and State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, for the proposition that challenges to jurors who would automatically vote for the death penalty if the defendant was convicted should be sustained. In those cases, the jurors said that they would refuse to regard the statutory requirement to consider any mitigating circumstances presented by the defense in making their determination. The situation presented in those cases is critically different from that presented by prospective jurors Honea and Pritchard. The jurors in the instant case would vote for the death penalty if mitigating factors were not presented by the defense. If mitigating factors were presented, they would garner these prospective jurors' due consideration.[4]
If there is at least one aggravating circumstance coupled with several mitigating factors, the death penalty is yet an option. Sawyer v. Whitley, 945 F.2d 812 (5th Cir. 1991), aff'd, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269, reh'g denied, 505 U.S. 1244, 113 S.Ct. 21, 120 L.Ed.2d 948 (1992). At the same time, the jury need not find mitigating *329 circumstances to recommend a life sentence. State v. Martin, 550 So.2d 568 (La.1989); State v. Watson, 449 So.2d 1321 (La.1984). These cases give jurors permission to recommend a life sentence in their discretion; they do not mandate that the juror be disposed to this option. Beyond the statutory requirement that jurors find one aggravating circumstance before recommending death, and consider mitigating factors where presented, the penalty in a capital case is absolutely optional. The role of the jury is to recommend a penalty based on facts and impressions gained from hearing the trial of the case filtered through their personal dispositions and beliefs.
The trial court is accorded broad discretion in ruling on challenges for cause. State v. Hallal, 557 So.2d 1388, 1389 (La.1990). A juror should be dismissed where "bias, prejudice or inability to render judgment according to law may be reasonably implied." Id. at 1390. This court does not give appropriate deference to the sound judgment of the trial court in making this determination. Assuming arguendo that some of the answers, viewed out of context, raise questions as to the validity of a challenge for cause, the trial judge was in the best position to hear and view the prospective jurors as their answers were given. One could debate the tenor of a written statement as it appears from a cold transcript, but the one who actually knows who actually judgesthe correct meaning and inference to be drawn from an answer is the trial judge. This experienced trial judge went to great lengths to preserve the integrity of the record and the right of the defendant to a fair trial and an orderly proceeding. The trial judge clearly answered any question that might have existed as to the viability of service of the prospective jurors.[5]
Stark answers from the record often present multiple potential interpretations. The sound judgment of the experienced trial judge here resulted in the correct conclusions. Our constitutional provision granting the defendant the right to a fair trial does not mean the State of Louisiana and its citizens are not likewise entitled to that same fair trial.
I respectfully dissent.
NOTES
[*] Pursuant to Rule IV, Part 2, Section 3, J. Marcus was not on panel.
[1] Vandervield's name at birth was Otis Keith Straughter. While living in California, he legally changed his name to Winston Vandervield. Both names appear in the record, but to avoid confusion only the name "Vandervield" will be used here.
[2] The record shows that Divers was born in Sterlington, La.
[3] This term meant that one or both of the victims had been paying Divers money to engage in homosexual intercourse with them.
[4] During his testimony, Elledge described himself as a "jailhouse" writ writer.
[5] The "substantial impairment" standard applies to reverse Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. 504 U.S. at 727-29, 112 S.Ct. at 2229. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause. In other words, if the juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause.
[6] One of the two other panel members, venireman Murphy, said these comments would not affect him. The other panel member, venireman Dean, admitted, "She influenced me, yes." Dean was removed at the defendant's request for cause.
[7] Furthermore, Pritchard's law enforcement ties exacerbated the problem. He was a revenue officer for the I.R.S. and had been for the past 14 years. R. at 3388-3389. When questioned about his responsibilities, he allowed that he conducted investigations. He also stated that he had powers of seizure, although not arrest. R. at 3397. He would not go into detail about his relationship with people at the sheriff's and district attorney's offices "because of the privacy act." However, he stated that most revenue officers and law enforcement personnel get to know each other over time. R. at 3399. The defendant's third unsuccessful challenge to Pritchard was on the basis of his law enforcement ties. R. at 4678-4679.
[1] It is noteworthy that neither of the two prospective jurors mentioned in this dissent actually served on the jury. Therefore, the jury that actually heard this case was fair and impartial. This writer would suggest that this point of the jury that actually served and its impartiality should be examined by this court in consideration of the rule set forth in Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), wherein the United Supreme Court stated: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (Emphasis supplied.) No "incompetent juror," as that term is defined in Ross, was forced upon this defendant. No substantial derogation of the defendant's rights would occur if the Ross rule is applied in this case.
[2] Excerpts from the testimony of prospective juror Pritchard:

Q.... Are you going to be able to say, "I will look at all the circumstances of the offense, any mitigating circumstances if there are any, see if the State proves their aggravating circumstances, consider the character and propensities"? Will you look at all of that?
By Mr. Pritchard: I think I can look at it, yeah. I may not agree with it, but I think I can look at it. R. 3385.
* * * * * *
Q.... And that you hoped you wouldn't go fishing for some reason to vote for first degree murder after you saw specific intent. Is that right?
By Mr. Pritchard: Yeah, that's right. Because one of the circumstances has to exist, the robbery or whatever that we was talking ... I mean it has to exist. Either it does or it doesn't. And I hope I wouldn't go fishing to try to find something and to try to connect that to the first degree. R. 3386.
* * * * * *
By Mr. Pritchard: I would do my best to follow the law ...
Q. Do your best, but you're not certain that you would follow the law?
By Mr. Pritchard: No, as I've said, I can't guarantee anything.
By The Court: ... Now, you may personally disagree with the law, but it will be one of your duties as a juror to apply that law, the law of Louisiana as it exist today, regardless of your personal feelings about the law. Do you understand that, sir?
By Mr. Pritchard: Yes I do, Your Honor.
By The Court: And can you do that?
By Mr. Pritchard: I think I can, but what I was trying to get at was that I would not try to come up and .. with one of the circumstances that would had to also exist, in the back of my mind say, "Well, maybe this over here really applies to this." R. 3387-3388.
[3] Voir dire of Mrs. Honea:

Q. What I'm asking you is, if you don't hear any reason from him why, or if you don't hear any kind of explanation, something to make it better, then you're going to impose the death penalty? Right? ...
By Mrs. Honea: Yes. R. 3053-3054.
[4] Voir dire of Mrs. Honea:

By Mrs. Honea: Well, like I say, if something happened that they was defending themselves or maybe ... I don't know, maybe had a good excuse ...
Q. What .. What I'm asking ... Yes, ma'am.
By Mrs. Honea: I really don't believe in just taking a life for a life. I don't believe in that. R. 3052.
Voir dire of Mr. Pritchard
Q. All right.... The second phase is the sentencing, and you consider the circumstances, the character, that kind of thing, aggravating circumstances, mitigating circumstances. Do you think just because you voted guilty at the first phase that you would automatically recommend the death penalty or would you consider anything and everything?
By Mr. Pritchard: I would hope I would consider the circumstances involved in it.
Q. And if you heard mitigating circumstances would you consider those?
* * * * * *
By Mr. Pritchard: Yes. I think I would.
Q. Okay. And is there any reason why you would automatically recommend death just because you had voted guilty?
By Mr. Pritchard: No. There again I'd have to look at the circumstances involved in it. R. 3370-3371.
[5] For example, before counsel ever raised an objection concerning the ruling on the challenge for cause of Pritchard, the trial judge dutifully noted a possible objection of the defendant for the record. R. 3407-3408. If the court's ruling had been so egregious or clearly wrong, surely counsel would have made such suggestion. This can only lead to the conclusion that the answers of Pritchard, when taken in context and in light of his demeanor as observed by the trial judge, show clearly that he would have followed the law and should not have been removed for cause.