Judgment rendered February 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,289-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DANIEL RALPH HAIRE                          Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 374,478

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Mary C. "Connie" Hanes

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

REBECCA A. EDWARDS
KODIE K. SMITH
VICTORIA T. WASHINGTON
Assistant District Attorneys

* * * * *

Before STONE, HUNTER, and ELLENDER, JJ.

**ELLENDER, J.**

Daniel Ralph Haire ("Haire") was convicted by a unanimous jury of manslaughter and possession of a firearm by a convicted felon. Following his adjudication as a second felony offender, Haire was sentenced to a total of 70 years at hard labor. He now appeals his convictions and sentences alleging the trial court erred in both denying one of his challenges for cause and in failing to properly instruct the jury, and that the sentences imposed were unconstitutionally excessive.

## FACTS

Haire, Rodney Nordby ("Nordby"), and Dillion Brown ("Brown"), all residents of Caddo Parish, had been mutual friends and were well acquainted with one another. On February 23, 2020, Haire, who had just recently been released from jail following a conviction for possession of methamphetamine, called the Shreveport Police Department to inform them he was receiving harassing calls and threats. Officer Raheem Roque was dispatched to Haire's home where he lived with his parents in the Broadmoor neighborhood. Haire told the officer he had received death threats from both Nordby and Brown, but he did not want anyone arrested; he just wanted it documented. Ofc. Roque examined Haire's phone, but the text messages with these individuals were only mutual conversations. Haire claimed the death threats were from the phone calls, not text messages. Though he did not inform the police on this day, Haire later told officers Nordby had chased him in his car a few days prior and had tried to run him off the road.

At some point during daylight hours of February 27, 2020, Haire called Nordby and asked him to come to his house so they could talk and

resolve their differences.  Haire claimed his intention was for Nordby to come over immediately so they could talk face to face, and he did not expect Nordby to come over that night.  Haire also claimed he instructed Nordby to call when he arrived.

At some point after it became dark, Nordby apparently drove his motorcycle near Haire's home, parked it, and then walked into their backyard.  Haire claimed his family, including his parents, sister, and nephew, had already gone to bed, but that he was still awake getting something to eat in the kitchen.  Haire said he spotted a dark figure through the window moving about in the backyard, so he grabbed his father's crossbow for protection and turned off the lights to be able to see better.  As Haire continued to observe through the kitchen window, he realized that it was Nordby in the backyard, who he believed was stealing items from the carport.  Haire later told officers Nordby was known to steal things from their home, which had made his dad angry, and filled Haire with rage that night.  Haire also claimed Nordby was aware his parents didn't want him in their carport/backyard area.

After another minute or so of watching, Haire kicked open the door to the carport and fired a shot with the crossbow at Nordby, who was holding a cellphone in his hand.  The bolt[1] from the crossbow, which was equipped with a broadhead typically outfitted with razor-sharp blades used to kill wild animals, struck Nordby in the upper left side of the chest, exiting through the middle of Nordby's back.  After being shot, Nordby ran inside the kitchen

---

[1] Though a crossbow fires arrow-like projectiles much like a regular bow, crossbow projectiles are referred to as "bolts" due to their relatively small length as compared to a normal arrow.

and fell on the floor bleeding significantly. Haire said he applied pressure to the wound, but claimed he did not call 911 because he was panicking and knew he would go to jail. Nordby ultimately died there on the floor from the wound.

Haire wrapped the body in bed sheets and a comforter, with black floral stitching on it, before putting the body in a trash can and mopping up the blood. Around 3 a.m. the next morning, Haire called Brown, who had a truck, and told him he needed help taking his trash to a dumpster. Though Brown did not know Nordby's body was in the trash can, they loaded it into the back of Brown's truck and dropped the can into a dumpster behind a nearby store. After a couple of hours, and while Haire and Brown were hanging out at Brown's house, Haire urged Brown to again help him move what they had just put into the dumpster. While assisting Haire with this move, Brown quickly realized what they were moving was a dead body wrapped in a comforter. The pair then got back in Brown's truck and Haire gave Brown directions to the end of Wallace Lake Road, where they both got out and threw Nordby's body, wrapped in the comforter, into the shallows of Wallace Lake. While there, Haire also threw the crossbow bolt, used to kill Nordby, into the lake.

The next day, Haire and Brown visited three area pawn shops and unsuccessfully attempted to pawn the crossbow. Haire and Brown also secured the motorcycle that Nordby had driven to Haire's house and gave it to one of their friends, Daniel Young ("Young"), who repainted it and stored it at Brown's residence.

Two days after the shooting, on February 29, 2020, the Caddo Parish Sherriff's Office ("CPSO") received a report of a suspicious bundle of

3

bedding located at the end of Wallace Lake Road. Officers responded to the scene and found the body of Nordby wrapped in a comforter. Upon inspection, Nordby was discovered to have a one-inch cut to his upper left chest and a similar injury to his back. An autopsy was later performed, which confirmed he died as a result of these wounds.

The ensuing CPSO investigation revealed Haire was one of Nordby's known associates. Detectives went to Haire's residence, where Haire's father gave consent to enter and search the home. The twin beds in Haire's bedroom were missing their linens and comforters, but pillow shams in Haire's closet were found with the same black floral stitching as was on the comforter found in Wallace Lake wrapped around Nordby's body. A crossbow bolt was also found in Haire's room, mounted with a practice tip. Trace amounts of blood were discovered on the floors in the home, which officers determined had been mostly cleaned up with solutions.

While at the Haire household, the CPSO learned Brown was also a known associate of Haire. On the night of February 29, 2020, detectives went to Brown's residence, where he lived with his grandparents a few blocks from Haire, and received permission from Brown's grandmother to search the home. While conducting the search, they spotted a motorcycle in a shed outside and, after obtaining a search warrant, found the motorcycle to have been recently painted. Brown's grandmother informed them Young had been working on the motorcycle. She also told the detectives that Brown, his girlfriend, and Haire had left earlier that night to go gambling at the casinos. After receiving more information about the type of car they were in, the vehicle was eventually located and stopped as it was returning to the Brown residence. Haire was found in the backseat of the car by

4

himself, with a crossbow and a .22 rifle.  The driver, Amy Willis, and passengers, Brown and Haire, were all taken into custody.

## PROCEDURAL HISTORY

Haire was charged by indictment with one count of second degree murder and one count of possession of a firearm by a convicted felon.[2]  Trial commenced on May 9, 2022, and the jury ultimately found Haire guilty of the responsive verdict of manslaughter, and guilty, as charged, of possession of a firearm by a convicted felon.

On May 19, 2022, the state filed an habitual offender bill of information charging Haire as a second felony offender based on his previous felony conviction for possession of marijuana-third offense, arising from a guilty plea on December 8, 2014.  A hearing was held on June 23, 2022, where Haire voluntarily pled guilty to being a second felony offender.

On July 14, 2022, Haire was sentenced to 70 years at hard labor, without the benefit of probation or suspension of sentence.  For his conviction of possession of a firearm by a convicted felon, Haire was sentenced to 15 years at hard labor, without the benefit of probation, parole, or suspension of sentence, and a fine of $2,500.  This sentence was set to run concurrently with his 70-year sentence.  Haire filed a motion to reconsider, which was subsequently denied.  This appeal followed.

## DISCUSSION

### *Challenge for Cause*

In his first assignment of error, Haire claims the trial court erred in denying his challenge for cause against potential juror Carlos Chenevert

_____

[2] Brown was charged with accessory after the fact to second degree murder, but was not tried together with Haire.

("Chenevert"). Haire was forced to use a peremptory challenge against Chenevert and ultimately exhausted all of his peremptory strikes. Haire challenged Chenevert because he was a CPSO deputy, knew several of the officers who had worked Haire's case, had worked on other cases with the prosecutor, and Chenevert's wife was also a deputy.

La. C. Cr. P. art. 797 provides five grounds a defendant may use to challenge a juror for cause:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Tucker*, 13-1631 (La. 9/1/15), 181 So. 3d 590; *State v. Colby*, 51,907 (La. App. 2 Cir. 5/30/18), 244 So. 3d 1260, *writ denied*, 18-1256 (La. 3/25/19), 267 So. 3d 596. A trial court's refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias or lack of impartiality of the prospective juror is properly remedied through rehabilitation. *State v.*

6

*Mickelson*, 12-2539 (La. 9/3/14), 149 So. 3d 178; *State v. Howard*, 98-0064 (La. 4/23/99), 751 So. 2d 783, *cert. denied*, 528 U.S. 974, 120 S. Ct. 420, 145 L. Ed. 2d 328 (1999). A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. *State v. Hust*, 51,015 (La. App. 2 Cir. 1/11/17), 214 So. 3d 174, *writ denied*, 17-0352 (La. 11/17/17), 229 So. 3d 928; *State v. Colby*, *supra*.

Haire argues his challenge for cause against Chenevert was erroneously denied, and he was forced to use one of his preemptory challenges. Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. *State v. Kang*, 02-2812 (La. 10/21/03), 859 So. 2d 649. This is because an erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. *Id.*; *State v. Cross*, 93-1189 (La. 6/30/95), 658 So. 2d 683. To obtain a reversal of his conviction and sentence, therefore, a defendant must show that: (1) the trial court erroneously denied a challenge for cause; and (2) he used all of his peremptory challenges. *State v. Divers*, 94-0756 (La. 9/5/96), 681 So. 2d 320; *State v. Coleman*, 32,906 (La. App. 2 Cir. 4/5/00), 756 So. 2d 1218, 1231, *writ denied*, 787 So. 2d 1010 (La. 2001).

Chenevert was an officer with the CPSO, the agency who investigated Haire's case, and was well acquainted with several of the investigating officers set to testify. However, this alone does not make him unqualified to serve as a juror. The Louisiana Supreme Court in *State v. Ballard*, 98-2198 (La. 10/19/99), 747 So. 2d 1077, eliminated the blanket rule that law enforcement officers are incompetent jurors in criminal cases, stating:

7

> Law enforcement officers are sworn to uphold the laws of the state, which laws include the provision of a fair trial to each and every defendant. If a law enforcement officer testifies under oath during voir dire that he can be a fair and impartial juror, the trial judge has the discretion to determine whether that officer is speaking the truth. The disqualification of all law enforcement officers from service on a jury disregards whether or not the judge, whose rulings on challenges for cause are given great deference in all other instances, accepts the officer as a fair and impartial juror. We find that such a disqualification amounts to an irrebuttable presumption of untrustworthiness in law enforcement officers and is an affront to police officers in this state.

*See also State v. Deruise*, 98-0541 (La. 4/3/01), 802 So. 2d 1224.

This court in *State v. Coleman*, *supra*, found a denial of a challenge for cause used against a potential juror who was a Police Juror and commissioned peace officer in the parish where the case was being tried, and knew several of the deputies who worked the case, was not reversible error. In doing so, this Court recognized a potential juror's association with law enforcement does not alone disqualify him, but such an association should still be closely scrutinized by the trial court and the appellate court. *Id.*

In *State v. Boyd*, 11-1129 (La. App. 4 Cir. 11/21/12), 104 So. 3d 642, a case out of Orleans Parish, a challenge for cause was used against an NOPD officer because he knew all the officers expected to testify at trial. The officer, who worked in the compliance division of the department, empathetically stated he could be fair and impartial despite his employment status, an assertion he maintained during additional questioning by the trial court. *Id.* The trial court ultimately denied (and the fourth circuit affirmed) the challenge for cause noting that just because someone is a police officer does not make him unsuitable as a juror. *Id.*

In *State v. Harris*, 18-800 (La. App. 3 Cir. 6/5/19), 274 So. 3d 178, *writ denied*, 19-01107 (La. 3/9/20), 294 So. 3d 486, the third circuit applied

*Ballard* to a Rapides Parish case and found the trial court properly denied a challenge for cause used against a prospective juror who was a retired Alexandria Police Department employee and, at the time of the subject trial, a crime prevention officer. The officer knew every officer on the state's witness list, had a son who was a State Trooper, and multiple other family members who worked in law enforcement in Rapides Parish; however, he was questioned extensively regarding these connections and "made it abundantly clear" he could be fair despite his employment situation. *Id.* After reviewing his voir dire, the third circuit found no basis to justify a challenge for cause against him. *Id.*

In the instant case, Chenevert repeatedly indicated he could be fair and impartial, despite his connections to law enforcement. He maintained this stance even when questioned about past incidents involving law enforcement and his previous experience serving on a jury. Chenevert also stated he would not give the testimony of any of the CPSO officers more weight during trial, and said he would vote not guilty if the state did not prove the case beyond a reasonable doubt. Lastly, Chenevert denied this would cause any issues at work if he voted not guilty and essentially went against some of his fellow officers.

After listening to and observing Chenevert as he gave these responses, the trial court denied the challenge for cause and kept Chenevert on the jury panel noting Chenevert did not say anything that would keep him from being fair and impartial. Chenevert openly shared his employment status with the CPSO and his relationships with many of their personnel before repeatedly reassuring the trial court he could be fair and impartial. As stated in *Ballard*, there is not a blanket rule that law enforcement officers are incapable of

9

serving as jurors in criminal cases. Thus, as a potential juror, Chenevert could be rehabilitated if the trial court was satisfied he could render an impartial verdict according to the evidence and instructions given by the court. *State v. Hust*, *supra*. The jurisprudence is also clear, officers who are thoroughly questioned regarding their employment status and relationships can still serve as jurors in criminal cases despite their working for the same agency that investigated the case or knowing many of the officers who are expected to testify. *See State v. Deruise*, *supra*; *State v. Boyd*, *supra*; *State v. Harris*, *supra*; *State v. Coleman*, *supra*.

Haire was thoroughly questioned by the trial court, denied having any knowledge about the case, and consistently answered he would be fair and impartial; thus, the trial court did not err in denying this challenge for cause. Our review of the entire voir dire reveals no abuse of discretion.

This assignment of error lacks merit.

### *Jury Instructions*

In his second assignment of error, Haire argues the trial court erred in failing to give the jury a requested instruction. Prior to resting, defense counsel stated he was filing an amendment to his previously submitted jury instructions requesting additional charges be added to include (1) an instruction on the law designating carports as dwellings, and (2) changing the definition of justifiable homicide from that found in La. R.S. 14:20(A)(1) to that found in La. R.S. 14:20(A)(4)(a), which addresses when a person is unlawfully present in a dwelling. In support of this request, defense counsel asserted the justifiable homicide instruction more closely fit the facts of the case than the self-defense language already included in the instructions. The state objected and argued there was no evidence Nordby was attempting to

10

unlawfully enter Haire's residence that night as Haire had invited Nordby to his home. The trial court agreed with the state and found the evidence did not support an unlawful entry, so the requested instruction on justifiable homicide was not included.

The jury was given the definition found in La. R.S. 14:20(A)(1), which provides:

A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

Haire argues the jury should have been allowed to weigh the testimony and decide if it believed Nordby was not authorized to be in Haire's carport, and thus Haire was allowed to use deadly force to compel Nordby to leave. Haire maintains his invitation to Nordby to come over to his house did not include permission to walk inside or enter any structures. La. R.S. 14:20(A)(4)(a) provides:

A homicide is justifiable *** [w]hen committed by a person lawfully inside a dwelling *** when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling *** or who has made an unlawful entry into the dwelling *** and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling[.]

The state points out Haire asked Nordby to come to his home and thereby consented to his presence there, thus the requested instruction was not supported by the evidence. The state also asserts Haire presented no evidence he reasonably believed the use of deadly force was necessary, and Haire's self-defense assertion was contradicted by his actions following the shooting.

11

A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La. C. Cr. P. art. 807. The charge, however, must be supported by the evidence. *State v. Perkins*, 13-1917 (La. 9/3/14), 149 So. 3d 206; *State v. Telford*, 384 So. 2d 347 (La. 1980). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to substantial rights of the accused, or a substantial violation of a constitutional or statutory right. La. C. Cr. P. art. 921; *State v. Perkins*, *supra*; *State v. Marse*, 365 So. 2d 1319 (La. 1978). Here, we find no miscarriage of justice, prejudice, or violations of rights, as the requested instruction was not supported by the evidence.

As pointed out by the state, Haire called Nordby and invited him to come to his home. Haire did not give Nordby a specific time to come over, but only instructed him to call when he arrived. Though the record varies as to how much time passed between the phone call and Nordby's arrival, it is clear some time passed and that it was nighttime when Nordby arrived. Haire stated he assumed Nordby would come over while it was still daylight, but this is nothing more than an assumption on Haire's part as the record reflects he did not specifically instruct Nordby to come over immediately. Even assuming Nordby would no longer be considered an invitee, there is no evidence to support Haire reasonably believed deadly force was necessary to compel Nordby to leave the premises. Based on the record before us, Haire did not present enough evidence to warrant a jury instruction for justifiable homicide protecting a dwelling. The trial court was ultimately in the best position to weigh the evidence and make this determination. Our review reveals no miscarriage of justice, prejudice to the substantial rights of Haire,

12

or any substantial violations of constitutional or statutory rights. *State v. Perkins*, *supra*. This assignment of error also lacks merit.

### *Excessive Sentence*

In his final assignment of error, Haire argues his 70-year total sentence is excessive. Haire submits the trial court considered only his current offense and his criminal record. He further points out he was 24 at the time of the offense, and is essentially receiving a life sentence.

A reviewing court applies a two-prong test to determine whether a sentence is excessive. First, we examine the record to see if the trial court used the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence. La. C. Cr. P. art. 894.1 (C). The goal of Art. 894.1 is an articulation of the factual basis for the sentence, not simply a mechanical compliance with its provisions. *State v. Lanclos*, 419 So. 2d 475 (La. 1982).

Our review confirms adequate compliance with Art. 894.1. Prior to sentencing Haire, the trial court first discussed La. C. Cr. P. art. 894.1 and noted its applicability as follows: (A)(1) – Haire has an extensive criminal history replete with drug possession and battery charges, thus he presents an undue risk that during a period of suspended sentence or probation, he will commit another crime; (A)(2) – Haire is in need of correctional treatment which may be provided to him while in prison; (A)(3) – The facts show Haire killed Nordby without justification, thus a lesser sentence would

deprecate the seriousness of taking another's life; (B)(1) – Haire's conduct during the commission of the offense manifested deliberate cruelty to the victim; additionally, based on the facts, Haire was not in peril and, if he was concerned about Nordby's actions, he could have locked the door and called the police; (B)(10) – Haire used a dangerous weapon in commission of the offense; and (B)(21) – Haire has an extensive criminal history dating back to 2012, including convictions for various types of batteries, marijuana use, and theft, and thus he has not learned from his prior behavior and this sentence might encourage him to reflect on his actions. The trial court also pointed out Haire was in possession of a .22 rile when he was arrested while being a convicted felon, putting his friends who were with him, and the public in general, in danger by his having access to a weapon. The trial court did acknowledge Haire testified he felt threatened by Nordby but, the court opined, it did not find his testimony concerning the threat compelling enough to act as a mitigating factor under Art. 894.1.

In addition to the sentencing guidelines, the trial court also articulated the following factors pertaining to Haire: (1) his long criminal history dating back to 2012, including four prior felony convictions; (2) multiple battery convictions; (3) his 29 different criminal charges, which show violent tendencies; (4) his previous hard labor sentences; (5) his lack of remorse; and (6) his criminal behavior indicates he has not understood the seriousness of his offenses.

Based on these numerous references to Art. 894.1, the trial court's specific discussion and application of both sections (A) and (B) of the article, and its articulation of six other pertinent factors it considered while

14

sentencing, it is clear the trial court properly and thoroughly took Art. 894.1 into account when sentencing Haire.

The second prong in reviewing a sentence is constitutional excessiveness. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering, *State v. Dorthey*, 623 So. 2d 1276 (La. 1993). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166. A trial court has wide discretion to sentence within the statutory limits; absent a showing of manifest abuse of that discretion, such a sentence will not be set aside as excessive. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Fruge*, 14-1172 (La. 10/14/15), 179 So. 3d 579. The sentencing court is not limited to considering only prior convictions and may review all evidence of prior criminal activity, including evidence that would otherwise be inadmissible at trial, e.g., prior arrests, hearsay evidence of suspected criminal acts, conviction records, and evidence of uncharged or nol prossed offenses. *State v. Washington*, 414 So. 2d 313 (La. 1982); *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031, and citations therein. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116; *State v. Bell*, 53,712 (La. App. 2 Cir. 1/13/21), 310 So. 3d 307.

15

Haire was convicted of two felonies, manslaughter and possession of a firearm by a convicted felon. For manslaughter, Haire was exposed to a maximum of 40 years at hard labor, La. R.S. 14:31; and for possession of a firearm by a convicted felon, he was exposed to a maximum of 10 years at hard labor, La. R.S. 14:95.1. However, Haire was also adjudicated a second felony offender. La. R.S. 15:529.1(A)(1) provides the following sentencing ranges for second felony offenders:

> (1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-third the longest term and not more than twice the longest term prescribed for a first conviction.

Pursuant to this article, Haire faced up to 80 years at hard labor for manslaughter and a maximum of 20 years for possession of a firearm by a convicted felon.

Haire's manslaughter conviction was a responsive verdict to his more severe original charge of second degree murder. As stated by the Supreme Court in *State v. Lewis*, 09-1404 (La. 10/22/10), 48 So. 3d 1073, and by this court in *State v. Gaines*, 52,536 (La. App. 2 Cir. 2/27/19), 266 So. 3d 948, *writ denied*, 19-00773 (La. 9/17/19), 279 So. 3d 379, in considering the nature of an offense for purposes of sentencing, both the trial court and the reviewing court may assess whether the crime for which the defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive verdict to the crime charged. Consequently, the trial court here, as well as this Court, may consider whether Haire's conviction adequately reflects his conduct.

On the date of the incident, the record supports Haire looked out his kitchen window and, though it was dark out, spotted Nordby in his backyard. Haire was very familiar with Nordby and claimed he believed Nordby was attempting to steal some of his family's belongings, which he was alleged to have done in the past. Despite observing him for several minutes from within his home, Haire felt the need to arm himself with a crossbow as Nordby remained in the backyard. Then, instead of opening the door and talking to Nordby, who was unarmed, about what he was doing, or locking the door and calling the police, Haire kicked open the door and immediately fired a shot from the crossbow at Nordby, striking him in the upper chest and killing him. By this own admission, Haire concedes he did not call the police or medical services at this point as he was worried he might go to jail, and instead unsuccessfully attempted to stop Nordby from bleeding. Haire's self-help efforts failed and he spent the next several hours removing evidence of his crime from his home and disposing of Nordby's body in a nearby lake.

While the jury was free to return a verdict responsive to the charged offense, the trial court was also justified in considering the actual conduct established at trial in imposing sentence. Haire received a substantial benefit by the jury's returning a responsive verdict of manslaughter, even though the facts suggest he could have been convicted of murder and, as a result, his potential exposure was reduced down from mandatory life imprisonment without benefits.

We recognize Haire's 70-year sentence is essentially a life sentence. However, pursuant to La. R.S. 15:574.4(A)(b)(ii), as it is presently written, Haire could be eligible for parole after serving 65% of his 70-year sentence,

17

should he meet all the required parole considerations. If paroled when eligible, Haire would be imprisoned for 45½ years of his 70-year sentence.

We also note, Haire has an extensive criminal history with multiple battery convictions and four prior felony convictions, not including the two felony convictions discussed in this opinion: (1) felony theft, on September 22, 2014; (2) possession of marijuana-third offense, on December 8, 2014; (3) introduction of contraband into a penal institution, on January 21, 2016; and (4) possession of schedule II CDS, methamphetamine, on August 30, 2018. As such, Haire could have potentially been adjudicated a sixth felony habitual offender. Additionally, the instant crimes occurred only a few weeks after Haire had been released from serving over a year in prison.

Based on these facts, we find Haire's 70-year total sentence is not constitutionally excessive, does not shock the sense of justice, nor is it a needless infliction of pain and suffering. Haire's final assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, we affirm Haire's convictions and sentences.

**AFFIRMED.**

18