691 So.2d 651 (1997)
STATE of Louisiana
v.
Leonard HART, Jr.
No. 96-KA-0697.
Supreme Court of Louisiana.
March 7, 1997.
*652 John R. Simmons, Jr., Covington, Nicholas Joseph Trenticosta, Julieann Hernon, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Walter P. Reed, Dist. Atty., Lewis V. Murray, III, Bogalusa, Millard Kensey Gatewood, Franklinton, Terry M. Boudreaux, Gretna, for Respondent.
KIMBALL, Justice.[*]
A Washington Parish Grand Jury indicted Leonard Hart, Jr. for the first degree murder of Ernest Emile Young, in violation of La. R.S. 14:30. After a trial by jury, Defendant was found guilty as charged and sentenced to death based upon the jury's finding of one aggravating circumstance. The trial judge sentenced Defendant to death in accordance with the jury's recommendation. This *653 is the direct appeal of Defendant's conviction and sentence.
For the reasons that follow, we reverse Defendant's first degree murder conviction and death sentence, but find the record supports the conclusion that Defendant is guilty of second degree murder and remand the case to the trial court for entry of judgment of guilty of second degree murder and for resentencing of Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, pursuant to La.R.S. 14:30.1.

FACTS
On the night of July 25, 1994, Bogalusa Police Officer Phillip Collins attempted to arrest Defendant on two attachments for unspecified city offenses. Following a brief scuffle, Defendant escaped from Officer Collins and hid in a nearby greenhouse, located four houses away from Ernest Emile Young's residence.
According to Defendant's confession, he decided to enter Young's residence to "get away from the police officer ..." and to "... find some drug money." A few months prior to this night, Defendant had performed some work for Young.[1] Defendant walked to the rear of Young's house, took a pair of hedge clippers, and cut out a section of the molding from the window in the back door by the kitchen. One pane of glass had already been removed during a burglary at Young's house in the previous week. Defendant removed the adjacent second pane of glass and slipped through the opening into Young's kitchen.
Alerted by the noise made by Defendant, Young emerged from his back bedroom. In his confession, Defendant stated that he and Young went back to Young's bedroom. There, Defendant tore a piece of Young's bedsheet and bound Young's hands together by crossing his wrists and knotting the rest of the sheet around Young's feet. Defendant left Young bound and lying on his bed, walked into the living room, spilled the contents of Young's wallet onto the floor, and removed approximately $25.00 from Young's wallet. Defendant then took Young's car keys, climbed into Young's car, and drove to Hammond. In his confession, Defendant estimated he only spent fifteen minutes inside Young's home. Throughout his confession, Defendant maintains he did not intend to harm Young, but only tied him up so he could safely get away.
At some point in his ordeal, Young rose from his bed and went into his living room, where he collapsed on the floor in front of his couch. In order to reach his couch, Young had to move past his unlocked front door. A telephone ordinarily rested on a small table located on the side of the couch in the living room. However, the phone line had been unplugged from its jack and moved to the other side of the couch across from the front door, where it was placed on the floor with the receiver off the hook.
While conducting an investigation into two local burglaries, the Hammond Police Department located Young's car in a local housing project and contacted the Bogalusa Police Department, requesting it determine who was driving Young's car. On July 30, 1994, Bogalusa Police Officers Phillip Collins and Tommie Sorrell went to Young's residence. Upon arriving at Young's residence, the Officers observed uncollected mail in the box on the front porch and uncollected newspapers dated July 26, 27, 28, and 29 scattered in the yard. Through the window in the front door, the Officers saw Young lying on the living room floor. The Officers entered the home through the unlocked front door. Once inside the home, the Officers testified they smelled an extremely foul odor and thought Young was dead. However, Young, who was lying in his own waste, with his wrists and feet bound, was alive but in an advanced state of dehydration.
The officers summoned an ambulance to Young's residence. Photographs taken while Young was still lying on the floor show that his wrists were extremely swollen and discolored.[2] *654 Officer Sorrell testified, "it appeared that this cloth material that his hands were tied with had cut through the flesh and it appeared that you could almost see the bone." Afraid to cause Young any further injury, the Officers left his hands tied while they waited for the ambulance. Officer Collins testified that he removed the sheet from the lower part of Young's body. When emergency medical personnel arrived, they cut the cloth ligatures from Young's hands and transported him to the emergency room at Bogalusa Medical Center. Richard Barber, one of the emergency medical technicians who cut the ligatures from Young's hands, testified that the ligatures appeared to have been tied real tight and that he could see bone and ligaments when he cut the ligatures.
At the Bogalusa Medical Center Emergency Room, Young was treated by Nurse Lynn Starkey. Nurse Starkey testified the medical staff was primarily concerned with the condition of Young's hands, as they were swollen and dripping fluid. According to Nurse Starkey, Young had urine and fecal matter all over him, a bed sore on his right buttock, and an abrasion on his right elbow. However, these were the only injuries sustained by Young.
Young was transported to Our Lady of the Lake Hospital in Baton Rouge, where he immediately underwent surgery to debride his wrist wounds and relieve the pressure. He was also placed on antibiotics to fight a systemic infection caused by the wrist wounds and given fluids intravenously to combat extreme dehydration. On August 5, 1994, Dr. Curtis Chastain II, an internist, took over Young's care. According to Dr. Chastain, Young's slurred speech and walk pattern indicated Young probably had a stroke. On August 6, 1994, blood appeared in Young's stool and he was placed on acidblocking medication.
Young died on August 9,1994. While Dr. Chastain and Dr. Richard Tracy, a pathologist who performed the autopsy on Young, disagreed as to the cause of Young's death, both agreed that the binding of Young's hands set his death in motion.[3]
Defendant was arrested on July 30, 1994, ten days before Young died. On July 30, 1994, Defendant gave the Hammond Police Department a statement detailing his involvement in two burglaries that took place in Hammond. On August 2, 1994, Defendant gave two statements concerning the Young burglary. Throughout both statements, Defendant maintained he did not intend to harm Young. Initially, Defendant was charged with aggravated burglary, aggravated kidnapping, crimes upon a person over sixty-five years of age, and theft of a vehicle. However, the charge was upgraded to first degree murder when Young died.
During their investigation of the crime scene, the police found a plastic hot dog wrapper lying on the floor in the back bedroom where Defendant tied Young up. While at the crime scene, the Officers noticed Young's house was stifling hot and turned on the only air conditioner located in the front room.[4] Several latent prints were lifted off the plastic hot dog wrapper, but none matched Defendant's prints. There is no evidence in the record indicating Defendant ever came into contact with Young's air conditioner and no useable prints were recovered from the telephone receiver.
On September 28, 1995, the jury found Defendant guilty of first degree murder. The jury determined Defendant possessed the requisite specific intent to kill or inflict great bodily harm upon Young while Defendant was engaged in the commission of an *655 aggravated burglary. The jury returned a penalty of death based upon their finding of one aggravating circumstance, that Defendant was engaged in the perpetration of an aggravated burglary at the time he committed his crime. On November 27, 1995, the trial judge denied Defendant's Motion For Post-Judgment Verdict of Acquittal and his Motion For A New Trial. In accordance with the jury's recommendation, the trial judge formally sentenced Defendant to death on November 29,1995.

LAW AND DISCUSSION
On appeal, Defendant alleges forty-two assignments of error, of which ten were argued. Because this court vacates Defendant's first degree murder conviction and death sentence for reasons given hereafter, we find it unnecessary to address any assignments of error relating to the penalty phase, or any unbriefed or unargued assignments of error pertinent to the guilt phase. State v. Bay, 529 So.2d 845, 846 (La.1988). However, because we find the evidence sufficient to support a conviction of second degree murder, we will address all briefed or argued assignments of error relating to pretrial issues and the guilt phase which would, if meritorious, require this court to remand the case for a new trial.

PRETRIAL ISSUES

Change of Venue
Defendant contends his conviction and sentence should be reversed based upon the trial court's failure to grant his motion for a change of venue on the ground that widespread publicity in the parish deprived him of the opportunity for a fair trial. The trial judge deferred ruling on the motion until voir dire was conducted. Voir dire took place on September 25 through September 27,1995.
La.C.Cr.P. art. 622[5] governs the grounds for a change of venue. To obtain a change of venue in any case in which the trial atmosphere has not been "utterly corrupted by press coverage," Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), a defendant "must prove that there exists a prejudice in the collective minds of the community that would make a fair trial impossible." State v. Lee, 559 So.2d 1310, 1313 (La.1990). However, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair." Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). La.C.Cr.P. art. 622 requires that the defendant "must prove more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish." State v. Comeaux, 514 So.2d 84, 90 (La.1987).
While the case was not well-publicized, voir dire revealed that nearly half of the sixtythree prospective jurors had heard at least something about the case.[6] Defense counsel maintains the widespread knowledge in the community of the crime had an especially pervasive effect because the community from which the jurors were drawn was extremely small and close knit, over one-third of the venire members were either related or knew each other, one-third had friends or relatives who worked for local law enforcement agencies, and approximately one-fifth of the jurors knew either the Defendant or the victim.
Only two newspaper articles were submitted by defense counsel at the close of voir dire. On September 26, 1995, the Bogalusa Daily News published a front-page story giving a brief recapitulation of the crime *656 and referred to the trial judge's pre-trial rulings excluding evidence of the Defendant's Hammond arrest for unspecified crimes and the commission of the burglary at Young's home on July 19, 1994. On September 27, 1995, the Era Leader (Franklinton newspaper) published a short, factual story about the trial in progress. These two news accounts in no way support a presumption of prejudice or give rise to concern that an inflamed and pervasive community opinion affected the answers of the jurors on voir dire examination. La.C.Cr.P. art. 622; State v. Clark, 442 So.2d 1129 (La.1983); State v. Goodson, 412 So.2d 1077 (La.1982).
Cause challenges allow a defendant in any community to winnow out those persons who are irrevocably committed to a fixed opinion or so closely allied with law enforcement personnel to give rise to a reasonable inference of partiality. Only five prospective jurors were challenged for cause by the defense based upon the fact that these jurors had fixed opinions regarding Defendant's guilt. The trial judge granted all five of these cause challenges. The trial judge granted two other defense cause challenges based upon the venire members' alliance with law enforcement officials. Our review of the record fails to support Defendant's claim that there existed such prejudice in the minds of the community from which the venire was selected that he was prevented from receiving a fair trial. State v. Lee, 559 So.2d 1310, 1313 (La.1990).

Denial of Cause Challenge
Defendant maintains the trial judge erred in failing to remove Juror Greg M. Darouse for cause. Prejudice is presumed when a challenge for cause is denied erroneously by the trial judge and the defendant has exhausted all of his peremptory challenges. State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320, 323; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 534; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280-81; State v. Ross, 623 So.2d 643, 644 (La.1993); State v. Bourque, 622 So.2d 198, 225 (La.1993); State v. Lee, 559 So.2d 1310, 1317 (La.1990); State v. Brown, 496 So.2d 261, 263-64 (La.1986). In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for cause; and (2) use of all his peremptory challenges. Maxie, 93-2158, 653 So.2d at 534. By the time Juror Darouse was called for voir dire examination, Defendant had exhausted all of his peremptory challenges. Therefore, Juror Darouse actually served on the jury which found Defendant guilty of first degree murder and sentenced him to death. Thus, the only issue presented is whether the trial judge's failure to remove Juror Darouse for cause was erroneous.
Defense counsel challenged Juror Darouse based solely on his opinions concerning capital punishment. When asked about the appropriate punishment for a person convicted of first or second degree murder, Juror Darouse responded that the penalty should be death. He went on to express his view that life imprisonment for an intentional murder was too lenient a sentence. Juror Darouse also stated he would adhere to his view on the proper penalty unless the eleven other jurors voted for life imprisonment, in which case, he would also vote for life imprisonment. However, when questioned by the trial judge, Juror Darouse stated he would consider both the penalty of life imprisonment and death if Defendant was convicted of first degree murder. The following colloquy transpired between the trial judge and Juror Darouse:
The Court: Mr. Darouse, sir, in the very beginning, I believe there was a question about your feelings concerning the death penalty and whether you could consider the death penalty in the sentencing phase of a first-degree murder. And correct me if I'm wrong, I believe your response was you felt like it should be automatically imposed; is that correct?
Juror Darouse: I think if you intentionally kill somebody, I think it should.
The Court: Will you accept as I instruct you the law that you should consider both the death penalty and life imprisonment? Can you accept that instruction, or are you unable to accept that instruction?
Juror Darouse: I can.

*657 The Court: In the event it got to the second phase and in the event that a firstdegree murder, the guilt phase was decided after deliberating, are you open to consider whether or not life imprisonment should be imposed or death imposed? Would you consider life imprisonment, or are you automatically going to impose the death penalty?
Juror Darouse: No. I'm not saying I'm going to automatically. I'm just saying that ought to be the law.
The Court: But you will abide by instructions to consider either or?
Juror Darouse: I would consider either. I'm just saying I think the law ought to be that.
The Court: You can set your feelings aside, though, and consider either penalty?
Juror Darouse: Yes.
The Court: Life or death considering what evidence you hear from that phase?
Juror Darouse: Yes, sir.
Satisfied Juror Darouse's responses rehabilitated him as a juror capable of considering both life imprisonment and the death penalty, the trial judge denied the defense's cause challenge.
La.C.Cr.P. art. 797[7] governs when a defendant may challenge a prospective juror for cause. The appropriate standard for determining when a prospective juror should be excluded for cause because of his views concerning the death penalty is whether this juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Wainwright v. Witt, 469 U.S. 412, 424,105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citing Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, 1234; State v. Sullivan, 596 So.2d 177, 186 (La.1992). If the prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him," the prospective juror's view substantially impairs the performance of his other duties. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); State v. Roy, supra; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1284. However, a trial judge's ruling concerning a challenge for cause is afforded great weight and "will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of discretion." State v. Bourque, 622 So.2d 198, 226 (La.1993). A trial judge's refusal to grant a cause challenge based upon the prospective juror's opinions concerning the death penalty is not an abuse of discretion where, after further inquiry (frequently referred to as rehabilitation), the prospective juror demonstrates a willingness and an ability to follow the law and decide the case impartially. State v. Roy, supra; State v. Maxie, supra.
In State v. Divers, supra, this court reversed a defendant's first degree murder conviction and death sentence based upon the trial judge's erroneous denial of two of defendant's cause challenges. One prospective juror in Divers emphatically maintained throughout voir dire that the death penalty was the only appropriate penalty for someone convicted of first degree murder. Even when the prosecutor in Divers attempted to rehabilitate the juror by asking him if he could set aside his personal opinions and apply the law, the juror stated, "I can't guarantee anything." This court ruled the cause challenge should have been granted based upon the juror's inability to follow the law and serve as an impartial juror under La. C.Cr.P. art. 797(2) and (4). Divers, 94-0756, 681 So.2d at 326. Another prospective juror in Divers also emphatically maintained that the death penalty was the only appropriate penalty for someone convicted of first degree murder. The trial judge attempted to rehabilitate the prospective juror by asking her if she would follow the law and his instructions. The potential juror responded with a simple *658 yes. Neither the prosecutor nor the defense attorney questioned this prospective juror further. This court ruled Defendant's cause challenge should have been granted because "[o]n the whole, her responses consistently demonstrated her inability to set aside her views and be impartial on the issue of punishment." Divers, 94-0756, 681 So.2d at 327.
Juror Darouse initially expressed the view that, in his opinion, the death penalty was the only appropriate sentence to impose upon a person convicted of first degree murder; however, he never stated he would not consider voting for a life sentence if the Defendant was found guilty of first degree murder. In fact, when questioned by the trial judge, Juror Darouse stated in his own words that he would not automatically vote for the death penalty, and that he could put aside his personal opinions and consider either penalty. In addition to Juror Darouse's responses to the trial judge, a review of the entire voir dire shows he understood the law and was willing to follow that law regardless of his own opinions concerning what he thought the law should be. Thus, the challenge for cause was properly denied.

GUILT PHASE ISSUES

Inadmissible Other Crimes Evidence
At a pretrial Prieur hearing, the State requested admission at trial of evidence that Defendant committed two burglaries in Hammond after taking the victim's car. The State argued the evidence of the Hammond burglaries should be admitted to show "the way this came to the attention of the Bogalusa Police Department and how Mr. Young, the victim in this case, was found." The trial court denied the State's motion, ruling the evidence of the Hammond burglaries inadmissible at the guilt phase as it was more prejudicial than probative. The trial court also ruled the evidence of the Hammond burglaries inadmissible at the penalty phase under State v. Jackson, 608 So.2d 949 (La. 1992).
In a bench conference conducted after jury selection and just before opening statements, defense counsel moved to delete a portion of Defendant's August 2, 1994 confession,[8] wherein Defendant had confessed to the Hammond Police Department that he burglarized Young's home and tied Young up. Within this confession, Defendant stated, "I was going into peoples houses when they were home, I didn't care if they had a gun or anything. All I wanted was alcohol and drugs." Defense counsel argued this statement should be redacted as it referred to the Hammond burglaries the court previously ruled inadmissible at both the guilt and sentencing phases of the trial. The trial judge refused to redact the statement, finding that it formed part of Defendant's exculpatory explanation of why he committed the Young burglary and tended to support Defendant's claim that he did not intend to harm Young.
Without objection by defense counsel, the prosecutor made the following statement during his closing argument,
This is Leonard talking. I didn't want to hurt nobody, and I still don't want to hurt nobody. I was going into people's houses when they were home. Think about that. I was going into houses when they were home. I didn't care if they had a gun or anything. He went into this man's house. He knew he was there. He didn't care. What does that tell you? Most times a burglary takes place ... eighty percent of them never get solved because nobody is there. Most burglars wait until they catch the place empty. They don't want anybody there. They don't want to get caught. They don't want to hurt anybody.
Because defense counsel failed to lodge a contemporaneous objection to the prosecutor's closing argument, this issue was not properly preserved for appeal. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. However, the trial judge's refusal to redact the statement concerning other crimes evidence was objected to; thus the issue of *659 whether the trial judge's refusal to redact this statement from Defendant's confession was erroneous is preserved on appeal.
La.R.S. 15:450 provides that "[e]very confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." However, a defendant may waive the protective benefit of La.R.S. 15:450:
Consequently, when the state seeks to introduce a confession ... which contains other crimes evidence, but which is otherwise fully admissible, the defendant has two options. He may waive his right to have the whole statement used, object to the other crimes evidence, and require the court to excise it before admitting the statement; or, he may insist on this right to have the statement used in its entirety so as to receive any exculpation or explanation the whole statement may afford. A third alternative, that of keeping the whole statement out, is not available to the defendant, unless of course, the confession itself is not admissible. State v. Morris, 429 So.2d 111, 121 (La.1983).
The trial judge ruled that evidence concerning the Hammond burglaries was inadmissible at Defendant's trial. Therefore, under Morris, supra, defense counsel's request for a redaction of the statement concerning the Hammond burglaries should have been granted by the trial judge.
This error, however, does not warrant reversal of Defendant's conviction and sentence, as it did not result in a fundamentally unfair trial. Defense counsel conceded at trial that Defendant committed an aggravated burglary. The sole contested issue at trial was whether Defendant had specific intent to kill or inflict great bodily harm at the time he committed the aggravated burglary. Defendant's references to his participation in other burglaries had no effect on the issue of whether there was sufficient evidence to support a finding that Defendant had specific intent to kill or inflict great bodily harm up Young while inside of Young's home on July 25, 1994. Thus, this error was harmless beyond a reasonable doubt. Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

Improper Prosecutorial Remarks
Defendant contends the prosecutor made improper remarks during voir dire and during closing argument in the guilt phase which deprived Defendant of a fair trial. During voir dire of the third and fourth panels of jurors, Defendant argues the prosecutor misstated the law regarding the elements of specific intent. The prosecutor informed the prospective jurors that "under the law, a person, all of us are presumed to intend the natural and probable consequences of our act or failure to act.... If you do something ... you must have intended for whatever happens when you did it to happen." Defense counsel did not object to this statement until the voir dire of the fifth panel of prospective jurors.[9] At the close of the guilt phase, the trial judge read the statutory definitions of general and specific intent as provided for by La. R.S. 14:10 to the jurors and instructed them that "[i]ntent is a question of fact which may be inferred from the circumstances."
The statements made by the prosecutor concerning specific intent were clearly misstatements of the law. However, at the close of the guilt phase, the trial judge properly instructed the jurors on the law. Under our jurisprudence, a prosecutor's misstatements of the law during voir dire examination does "not require reversal of a defendant's conviction if the court properly charges the jury at the close of the case." State v. Cavazos, 610 So.2d 127, 129 (La.1992) (per curiam) (citing State v. Holmes, 388 So.2d 722 (La.1980); State v. Shilow, 252 La. 1105, 215 So.2d 828 (1968)). Thus, the misstatements of law made by the prosecutor during voir dire do not mandate a reversal of Defendant's sentence and conviction.
Defendant also claims the portion of the prosecutor's closing argument referring to inadmissible other crimes evidence, the O.J. Simpson trial, and facts not introduced into *660 evidence were devastatingly prejudicial and mandate reversal of Defendant's sentence and conviction. However, defense counsel failed to object to any portion of the prosecutor's closing argument. Thus, this court will not address any of these issues. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364.
In his rebuttal argument at the guilt stage, the prosecutor instructed the jury "to do justice in this case for this family and [for the defendant] ... but I'm going to tell you justice for them and justice for him ain't the same thing." Defendant immediately moved for a mistrial. The trial judge denied Defendant's mistrial motion but admonished the jury as follows:
I'm going to admonish you that at the close of the prosecutor's argument, I have ruled that there was an improper statement made referring to your job to do justice for the victim's family. That is improper argument. You should disregard that.
Defendant maintains this improper remark made by the prosecutor warrants reversal of his conviction and sentence as it interjected an arbitrary factor into the jury's deliberations. The prosecutor's remark was improper; however, it does not require reversal unless this court is "thoroughly convinced that the jury was influenced by the remarks and that such contributed to the verdict." State v. Jarman, 445 So.2d 1184 (La.1984). This court must also give credit "to the good sense and fairmindedness of jurors who have heard the evidence." Id. As previously stated, the main issue in this trial centered around whether Defendant had specific intent to kill or inflict great bodily harm when he was inside Young's home on July 25, 1994. The prosecutor's brief appeal for "justice" for the victim's family was not prejudicial enough to have contributed to the jury's guilty verdict. See State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272; State v. Moore, 432 So.2d 209 (La.1983); State v. Morris, 414 So.2d 320 (La.1982).

Erroneous Jury Charges
Defendant complains about three of the trial court's charges to the jury.[10] However, defense counsel failed to lodge a contemporaneous objection to any of the trial judge's jury instructions. Therefore, this court will not address this claim. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364.

Ineffective Assistance of Counsel
Defendant contends his conviction and sentence should be reversed because he was denied his constitutional right to effective assistance of counsel under U.S. Const. amend. VI, La. Const. art. I, § 13, and Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), based upon his trial counsel's ineffective assistance during voir dire examination and at the guilt phase of Defendant's trial. According to Defendant, his trial counsel made numerous errors including, inter alia, the following: failure at voir dire to inquire as to whether prospective jurors could consider relevant mitigating evidence in Defendant's case; failure to conduct voir dire on racial issues; failure to issue appropriate cause and peremptory challenges; failure to rehabilitate Witherspoon excludable venirepersons; failure to object to the unorthodox summoning of prospective jurors; failure to assert a defense of not guilty by reason of insanity; failure to assert a defense of intoxication; failure to obtain a medical expert to explore the exact cause of Young's death; failure to object to the introduction of four autopsy *661 photographs; failure to object to the introduction of evidence highlighting Defendant's prior bad acts; failure to pursue information that several jurors witnessed Defendant wearing shackles; and conceding that Defendant was guilty of aggravated burglary.
Although ineffective assistance of counsel claims are generally relegated to postconviction proceedings, State v. Burkhalter, 428 So.2d 449, 456 (La.1983), this court has addressed ineffective assistance of counsel claims on direct review where the record discloses the necessary evidence to decide this issue. State v. Ratcliff, 416 So.2d 528, 530 (La.1982). However, the record in this case does not contain sufficient evidence for this court to fully explore Defendant's ineffective assistance of counsel claim. Therefore, this claim is relegated to post-conviction proceedings.

Sufficiency of the Evidence to Support First Degree Murder Conviction
Defendant maintains his conviction and sentence should be reversed because there is insufficient evidence to support the jury's finding that he had specific intent to kill or inflict great bodily harm while inside of Young's home on July 25, 1994. In order to convict Defendant of first degree murder in this case, the State was required to prove the following elements beyond a reasonable doubt: (1) Defendant had specific intent to kill or inflict great bodily harm; (2) while he was engaged in the perpetration of an aggravated burglary. La.R.S. 14:30(A)(1). Defense counsel conceded Defendant was engaged in the perpetration of an aggravated burglary when he entered Young's residence on July 25, 1994. Thus, the only issue is whether Defendant had the requisite specific intent to kill or inflict great bodily harm while he was within Young's residence on July 25, 1994. Before this court will reverse Defendant's first degree murder conviction, we must determine that no rational trier of fact could have concluded beyond a reasonable doubt, on the basis of the evidence viewed in the light most favorable to the prosecution, that the Defendant had the specific intent to kill or inflict great bodily harm upon Young while he was inside Young's home on July 25, 1994. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); La.C.Cr. P. art. 821.
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La.R.S. 14:10. There is no statutory or jurisprudential definition of great bodily harm; however, the phrase is sufficiently clear to meet constitutional standards of notice. State v. Mitchell, 412 So.2d 547, 550 (La.1982).
In this case, the evidence, even when viewed in the light most favorable to the prosecution, fails to persuade this court that any rational trier of fact could have found Defendant guilty of first degree murder beyond a reasonable doubt. The only evidence presented by the prosecutor was the fact Defendant entered Young's home and tied Young up using the cloth from Young's bedsheets. However, the fact Defendant tied Young up does not equate to a finding that Defendant had specific intent to kill or inflict great bodily harm upon Young while Defendant was inside Young's home. Defendant used soft cloth to bind Young's wrists as opposed to a wire material which one would expect to cut into a person's skin and cause additional injury. While the wrist ligatures may have been tied tightly, the evidence shows the leg bindings were so loose that Officer Collins was able to remove the sheet without even untying the knots in the sheet around Young's legs. The Defendant did not bind Young's wrists behind Young's back, he did not "hogtie" Young, and he did not tie Young to the bed by connecting the ligatures on his hands and feet to the bed. After Defendant tied Young up, there is absolutely no evidence showing Defendant then physically assaulted Young in any way to cause Young to suffer further injury. Nor did Defendant insert any type of gag into Young's mouth to prevent Young from crying out for help. In fact, the evidence indisputably shows Young was able to get up from his bed and go into his living room.
*662 Based upon the foregoing evidence, there was at least a reasonable doubt the Defendant tied Young up in order to assure himself a safe getaway. Thus, no rational trier of fact could have concluded beyond a reasonable doubt, even when the evidence is viewed in a light most favorable to the prosecution, that Defendant specifically intended to kill or inflict great bodily harm upon Young while inside Young's home on July 25, 1994. Therefore, Defendant's first degree murder conviction and death sentence must be reversed.
Under State v. Byrd, 385 So.2d 248, 251 (La.1980), "the discharge of the defendant is neither necessary or proper when the evidence does support a conviction on a lesser and included offense which was a legislatively authorized responsive verdict." La.R.S. 14:30.1, in pertinent part, defines second degree murder as the killing of a human being when the offender is engaged in the perpetration of an aggravated burglary.[11] Defense counsel concedes that Defendant was engaged in the perpetration of an aggravated burglary when he entered Young's home on July 25, 1994. Furthermore, second degree murder is a legislatively provided responsive verdict to first degree murder. La. R.S. 14:29. Thus, it is not necessary to remand this case for a new trial in order to convict Defendant of second degree murder.[12]
Accordingly, we remand this case to the trial court for entry of judgment of guilty of second degree murder and sentencing of defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with La. R.S. 14:30.1(B).

DECREE
For the reasons assigned, we set aside Defendant's first degree murder conviction and death sentence and remand for entry of judgment of guilty to second degree murder and sentencing of Defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence as provided for in La.R.S. 14:30.1(B).
CONVICTION AND DEATH SENTENCE SET ASIDE; REMANDED TO THE DISTRICT COURT FOR ENTRY OF JUDGMENT OF GUILTY OF SECOND DEGREE MURDER AND SENTENCING OF DEFENDANT TO LIFE IMPRISONMENT AT HARD LABOR WITHOUT BENEFIT OF PAROLE, PROBATION, OR SUSPENSION OF SENTENCE.
KNOLL, Justice, dissenting.
While I agree with my colleagues that defendant did not intend to kill Mr. Young, I disagree with the majority conclusion that defendant did not intend to inflict great bodily harm upon Mr. Young, primarily because of the victim's age, disability, and living alone.
The record shows that the defendant needed $300.00 a day to support his crack cocaine addiction. Two months before defendant burglarized Mr. Young and tied him up, defendant worked for Mr. Young for two days. This gave defendant the knowledge that his prey lived alone, was old, 83 years of age, and frail. Mr. Young was lame and walked with a cane, and had a bad heart condition.
There is a gap in the evidence as to how Mr. Young got from his bed, if indeed he was tied up in bed at all, onto the hard wood floor in his living room where he was found. The only evidence that he was tied up in bed is the defendant's own statement. The pictures of the victim in the record show that the hardwood floors in Mr. Young's living room were badly stained from body fluids that dripped from Mr. Young's wounded hands, and from his fecal and urine excretions, supporting *663 the conclusion that he was lying there a long time. If Mr. Young walked from his bed to the spot where he was found, it cannot be explained why he could not have walked a few more feet to his unlocked front door and out, where eventually someone would have seen him. This elderly man was sufficiently injured by defendant that he was prevented from getting up and walking just a few additional feet to his door.
The medical testimony shows that the trauma Mr. Young suffered during the burglary caused cascading medical complications, triggered by the wounds cut into his wrists. While defendant used a soft cloth to bind Mr. Young, he tied his hands so tight that it cut the blood supply to his hands, which were very swollen and black when he was found. In addition, he had no food or water for six days in a stifling hot room, and suffered from malnutrition and profound dehydration. The medical testimony shows that Mr. Young's hands were in an advanced state of necrosis (gangrene), that he suffered severe pain, and that he was complaining of severe pain in his knees just before he died. Because he was without food and water, and because of the trauma he had suffered, he quickly developed stress induced gastritis and formation of duodenal ulcers, which eventually ruptured and caused internal bleeding. When he was found, he was incoherent and very near death.
The legislature amended La.R.S. 14:30 in 1993 to include "specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve or sixty-five years of age or older." In my view, this amendment supports that the very young and the aged are an especially vulnerable class of victims because they are generally weaker. It is apparent that Mr. Young need not have been bludgeoned in order to have sustained the great bodily harm he did because he was 83 years of age and in frail health. In my view, a great amount of force is not necessary to prove specific intent to kill or inflict great bodily harm on this class of victims. For these reasons, I respectfully dissent and would affirm defendant's conviction and sentence.
NOTES
[*] "Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] Two checks made payable to Defendant signed by Young totaling $175.00 were introduced into evidence. One check was dated May 24, 1994 and the other May 25, 1994.
[2] While waiting for the ambulance to arrive, the Officers called their immediate supervisor, Lieutenant Charlie Davis, who arrived on the scene just before the ambulance and photographed Young in exactly the same position as the Officers had found him.
[3] Dr. Chastain testified, "... it looks like he had stress induced gastritis and formation of duodenal ulcers from acid secretion from stressors that the ulcers got so deep, they bore into the blood vessels that lined the small intestines or the stomach, the blood vessels ruptured and he bled." Dr. Tracy testified that Young died from systemic blood poisoning caused by bacteria which invaded the open wounds caused by the wrist ligatures.
[4] The air conditioner was off when the Officers arrived at Young's house.
[5] La.C.Cr.P. art. 622 provides:

A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
[6] Of the sixty-three prospective jurors called for voir dire examination, twenty-nine venirepersons knew something about the case, either from the initial media reports of the crime when it occurred, or from two newspaper articles published during the three-day jury selection process.
[7] La.C.Cr.P. art. 797 provides in pertinent part that a defendant may challenge a juror for cause on the ground that:

(2) The juror is not impartial, whatever the cause of his partiality.
(4) The juror will not the accept the law as given to him by the court.
[8] In another confession made by Defendant on August 2, 1994, there was a reference to the prior burglary (one which occurred a week before July 25, 1994) of Young's home. Evidence of this prior burglary had already been ruled inadmissible at trial. The trial judge denied defense counsel's motion to redact this reference, finding it a harmless statement. However, the trial judge cautioned the prosecutor not to bring any undue attention to this reference.
[9] By this time, four jurors had been selected.
[10] Defendant's complaint concerns the following jury instructions given by the trial judge at the conclusion of the guilt phase:

1) "If you are not convinced that the defendant is guilty of the offense charged, you may find the defendant guilty of a lesser offense if you are convinced beyond a reasonable doubt the defendant is guilty of a lesser offense." Defense counsel claims this "acquittal first instruction" had the effect of taking away the possible lesser verdicts from the jury's consideration unless they all agreed Defendant was not guilty of first degree murder.
2) "Intent is a question of fact which may be inferred from the circumstances." Defense counsel claims this "specific intent instruction" was impermissible under Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
3) "Reasonable doubt is doubt based on reason and common sense. It exists if you are not convinced by the evidence of the truth of the charges." Defense counsel claims this "reasonable doubt instruction" was impermissible under Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
[11] La.R.S. 14:60, in pertinent part, defines aggravated burglary as the unauthorized entry of any inhabited dwelling with the intent to commit a felony or theft therein, if the offender commits a battery upon any person while in such place.
[12] This court has reduced a first degree murder conviction to second degree murder without remanding the case for a new trial on one other occasion. State v. Bay, 529 So.2d 845 (La. 1988).