723 So.2d 484 (1998)
STATE of Louisiana
v.
Ronald SINGLETON.
No. 98-KA-387.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 1998.
*485 Bruce G. Whittaker, Louisiana Appellate Project, Gretna, for Appellant.
Paul D. Connick, Jr., District Attorney, Rebecca J. Becker, Counsel of Record on Appeal, Terry Boudreaux, Michael Ciaccio, Quentin Kelly, Assistant District Attorneys, Gretna, for Appellee.
Panel Composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS C. WICKER, Jr., Pro Tempore.
THOMAS C. WICKER, Jr., Judge Pro Tem.
The defendant, Ronald Singleton (Singleton), was charged by indictment with the second degree murder of Leroy Woodard (Woodard) in violation of La.R.S. 14:30.1. Singleton filed a motion to withdraw his plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity. The trial court held a sanity hearing and found the defendant competent to stand trial. Singleton filed a motion to suppress evidence seized as the result of a search warrant. The trial judge denied the motion to suppress. After trial by jury, the defendant was found guilty as charged. The trial judge sentenced the defendant to the mandatory term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Singleton now appeals. We affirm.
On appeal Singleton assigns the following errors:
1. The trial court erred in denying appellant's motion to suppress.
2. The trial court erred in permitting the state, in rebuttal, to play selected portions of a taped statement obtained from appellant by the state's forensic psychiatrist.
3. The trial court erred in denying appellant's motion for a mistrial premised upon the state's explicit reference to the fact *486 that appellant was incarcerated at the time of trial.
4. Assigned as error are any and all errors patent on the face of the record.
The testimony at trial set forth the following. Singleton testified as follows. On Halloween night, 1996, he was at home with his daughter when he received a telephone call from a friend, Carlos Lawrence (Lawrence). Lawrence told Singleton that Woodard and two friends, who were armed, were looking for Singleton. Approximately ten minutes after receiving this information, Singleton spotted a red Cutlass driving in front of his (Singleton's) house. Singleton was frightened. He took his daughter to his brother's house.[1] Thereafter Singleton went to a club accompanied by some friends. When he and his friends saw the red Cutlass pull up to the club, they left and went to Schnell's Restaurant. As Singleton was walking into the restaurant, he saw Woodard staring at him. He stated he was frightened. He testified that he saw Woodard enter his car and reach down under the seat. At this point the defendant started shooting his gun toward Woodard. He stated that he was approximately one car length away from Woodard, and that his eyes were closed when he shot Woodard. The defendant testified that he felt that if he didn't shoot Woodard, Woodard would have "pulled a gun" on him.
Singleton explained he had previous altercations with Woodard; namely, a shooting incident, being "pistol whipped" by Woodard, and having his car burned by Woodard. Singleton stated that he was frightened of Woodard, tense, nervous, and scared for his life. He testified that he ran away after the shooting because he was afraid. He admitted that in his first statement to Detective Ralph Sacks (Sacks) he had denied shooting Woodard. He explained that at that time of his denial he did not think Sacks would understand if he admitted the shooting. However, Singleton stated he gave a second statement on a later date admitting he shot Woodard. He explained that he did so after Sacks informed him the investigation revealed that Woodard was a "scumbag" and that Singleton had done society a favor. Singleton also testified that Sacks told him he would probably receive a light sentence. As a result, Singleton stated he trusted Sacks and confessed.
Clifton Lewis (Lewis) testified he had known Woodard for years. Lewis stated he spoke with Woodard prior to the shooting when Woodard entered Schnell's Restaurant. Upon leaving the restaurant, he and Woodard walked toward different areas of the parking lot. Lewis heard gunshots and noticed these were coming from the direction of a fence. He saw the person who fired the shots but could not identify the assailant because he was dressed in black and wore a mask. Singleton testified that at the time of the shooting he was wearing blue jeans and a black sweatshirt but that shortly before the incident he wore a white tee shirt.
The state's witnesses established that the cause of death was a gunshot wound to the chest.
Sacks testified he was called at approximately 3:00 a.m. on November 1, 1996 to investigate Woodard's murder at Schnell's Restaurant in Marrero. Sacks obtained a search warrant on November 4, 1996, to search the defendant's residence at 1988 South Forest Lawn, Apt. 17, in Gretna, Louisiana. The search warrant described the perpetrator of the crime to be a tall thin man wearing a black hooded sweatshirt, black pants, and a hockey-type mask. The search warrant also enumerated incidents in an ongoing feud between the defendant and the victim. Specifically, the warrant discussed 1) a shooting in which the defendant and some friends fired shots at the victim from a moving vehicle, 2) the defendant being "pistol whipped" by the victim, 3) the defendant's car being burned, allegedly by the victim and 4) the defendant and the victim engaging in a fist fight with the victim showing the defendant a handgun. Sacks testified that he *487 executed the search warrant and recovered a black hooded sweatshirt and black sweat pants from the defendant's residence, and a blue hooded sweatshirt from the defendant's car. Sacks stated he did not find a mask or gun during his search. That same evening Singleton waived his rights and gave Sacks a voluntary statement in which he denied responsibility for the murder. Singleton also admitted having an ongoing problem with Woodard. Singleton was released.
Sacks further testified he subsequently obtained an arrest warrant for the defendant, and arrested him on November 6,1996. Following his arrest, the defendant again waived his rights and gave another statement to Sacks. However, in the second statement Singleton admitted he shot the victim because of an ongoing feud. Sacks further testified Singleton never stated he was afraid of the victim, nor did he tell Sacks that he shot the victim in self-defense. Sacks denied telling Singleton that he would get a "light sentence" if Singleton admitted shooting the victim.
Louis John Favorite testified he witnessed an incident in October 1996 in which Woodard beat Singleton in the head with a pistol in an unprovoked attack. Greg Favorite, another witness, stated he heard the noise from the altercation and observed Woodard in possession of a gun but did not see Singleton. Charles Simmons testified that in October 1996 Singleton ran into his shop telling him he was hit in the side of the head with a gun. Charles Simmons stated he saw a bruised area on Singleton's head. Angela Mouton, the defendant's ex-girlfriend, stated that in May of 1995 Singleton borrowed her car. The car was returned with bullet holes. She also testified that on another occasion she saw Woodard threaten Singleton with a gun.
Ruby Bernard (Bernard), Singleton's grandmother, testified that approximately two to three months before the incident Singleton called her two to three times a week telling her that he was being threatened. Singleton asked Bernard to pray for him. Bernard testified that she told Singleton to call the police. Singleton told Bernard he had done so to no avail.
Dr. Sara Delaune, a defense expert in forensic psychiatry, testified that she interviewed Singleton. Dr. Delaune stated it appeared that at the time of the shooting that the defendant was in a "heightened awareness" state, and that he was exhibiting most of the features of Post Traumatic Stress Disorder. Dr. Delaune testified, however, that she saw no indication of a major mental illness which would have precluded the defendant from knowing right from wrong at the time of the offense, and that the defendant did not meet the criteria for legal insanity. The state's expert witness, Dr. Robert Whitney Davis, an expert in forensic psychiatry, also agreed that the defendant was legally sane at the time of the incident. Dr. Davis further testified that the defendant was competent to stand trial.
On rebuttal the state called Leslie Lockhart, the assistant manager at the Lewisburg Square apartment complex, where the defendant once resided. Lockhart testified that approximately three days after the defendant's car was burned in 1995, she called the police because the defendant was walking around with a gun. She stated that after she called the police, the defendant called her. He was upset at the time and stated he was trying to protect himself from individuals who were threatening him. Although he stated he was going to get these individuals before they got him he did not specifically tell her he was going after anyone.

MOTION TO SUPPRESS:
Singleton contends that the trial court erred in denying his motion to suppress the evidence seized at his residence pursuant to the search warrant. He argues that the evidence should have been suppressed because the search warrant had a critical defect in that it failed to allege that the defendant resided at, or was in any way connected to the Forest Lawn address specified on the warrant, and accordingly the warrant failed to establish reasonable cause to believe that the items searched for were located at the premises.
At the hearing on the motion to suppress, Sacks testified that during his investigation of Woodard's murder, he learned of an ongoing *488 feud between the defendant and the victim. Based upon that information, Sacks applied for a search warrant, which was signed on November 4, 1996. Pursuant to the warrant, Sacks searched the defendant's residence, and seized a black hooded sweatshirt, black sweat pants, and a blue hooded sweatshirt.
The trial court denied the defendant's motion to suppress the evidence, and the defendant's motion to suppress the confession. At the time of the denial, the defendant noted only his objection to the denial of the motion to suppress the confession. On appeal, the defendant now argues that the search warrant was deficient. Singleton filed a general motion to suppress the evidence. However, the defendant did not offer evidence in the proceedings below to show that the warrant was deficient.
La.Code Crim. P. Art. 703 D provides in pertinent part that "on the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion..." Additionally, "An affidavit supporting a search warrant is presumed to be valid and the defendant has the burden of proving that the representations in the affidavit are false." State v. Brown, 93-2089 (La.App. 4th Cir. 12/16/94), 647 So.2d 1250, 1253, writ denied, 95-0497 (La.12/6/96), 684 So.2d 921.[2]
Although the defendant raised the validity of the search warrant in his motion to suppress, his specific contention regarding the deficiency of the search warrant is presented for the first time on appeal. However, even assuming the issue is properly before this court, we find no merit to this assignment.
The defendant alleges that the evidence should have been suppressed because the search warrant application failed to establish reasonable cause to believe that the items would be at the Forest Lawn address as the warrant failed to specify that address as the defendant's residence. The Louisiana Supreme Court in State v. Varnado, 95-3127 (La.5/31/96), 675 So.2d 268 recently addressed this issue. The search warrant in Varnado, as in this case, specifically identified the premises, and the objects to be searched for, but failed to identify the premises as the defendant's residence. The Varnado court relied upon the good faith exception to the exclusionary rule as expressed in United States v.. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and explained:
[t]he exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Leon, 468 U.S. at 916, 104 S.Ct. at 3417. Its application therefore "must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness." Id., 468 U.S. at 907 n. 6, 104 S.Ct. at 3412 (quoting Illinois v. Gates, 462 U.S. 213, 257-58, 103 S.Ct. 2317, 2342, 76 L.Ed.2d 527 (1983)) (White, J. concurring in the judgment). As a general rule, "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." Leon, 468 U.S. at 921, 104 S.Ct. at 3419. Accordingly, "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id., 468 U.S. at 918, 104 S .Ct. at 3418 (footnote omitted).
Leon's good faith rule presupposes that the police "have a reasonable knowledge of what the law prohibits." Id., 468 U.S. at 919 n. 20, 104 S.Ct. at 3419. We need not, however, decide here as a general matter whether a search warrant which fails to provide any nexus between the items sought and the targeted premises is so lacking in the indicia of probable cause that any "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id., 468 U.S. at 922 n. 23, 104 S.Ct. at 3420.
The reasonableness inquiry under Leon is an objective one which turns on the totality of the circumstances surrounding *489 the issuance of the warrant. Id., 468 U.S. at 922 n. 23,104 S.Ct. at 3420 n. 23. Those circumstances include the overall familiarity of the officer applying for the warrant with the investigation and the degree to which he has participated in the events leading to the search. See Massachusetts v. Sheppard, 468 U.S. at 989 n. 6, 104 S.Ct. at 3428 n. 6 ("In this case, Detective O'Malley, the officer who directed the search, knew what items were listed in the affidavit [he] presented to the judge ... Whether an officer who is less familiar with the warrant application or who has unalleviated concerns about the proper scope of the search would be justified in failing to notice [the] defect ... in the warrant in this case is an issue we need not decide.")
Varnado, supra, at 270.
The Varnado court held that evidence seized was admissible under the good faith exception to the exclusionary rule. The defendant in the instant case argues that Varnado is factually distinguishable because in Varnado, the defendant's father had previously given consent to the search and the defendant was already under arrest. However, these factors were not dispositive in the Varnado holding because the search in Varnado was not reviewed as a consent search, or a search incident to arrest. Rather the Varnado court reviewed the validity of the search warrant issued in that case. In the instant case, although the warrant fails to specify that the address to be searched was in fact the defendant's residence, Sacks' testimony indicates that he was aware that the defendant was living at the Forest Lawn address, and any omission was inadvertent. At no point prior to or during trial, did the defendant offer evidence to challenge the search warrant itself and thus he did not meet his burden of showing that there were intentional misrepresentations in the affidavit. See, State v. Brown, supra.
Moreover, the fruit of the search in question consists only of the black hooded sweat suit and the blue hooded sweatshirt. These items could serve the purpose of connecting the defendant to the shooting. However, in light of the defendant's confession that he shot the victim, the admission of these items constitutes harmless error. See, State v. Scott, 573 So.2d 556, (La.App. 5th Cir.1991), writ denied, 577 So.2d 13 (La. 1991).

TAPED STATEMENT:
Singleton argues the trial court erred in permitting the state, in rebuttal, to play selected portions of a taped statement obtained from appellant by the state's forensic psychiatrist. On rebuttal the state called Dr. Davis, a forensic psychiatrist, to testify regarding the defendant's mental condition. Dr. Davis testified he interviewed Singleton approximately an hour and a half. He stated he informed Singleton that the interview would not be confidential and that he (Dr. Davis) was hired by the state. He also informed Singleton that his statements could be used against him. Dr. Davis stated that he interviewed the defendant and that during the interview the defendant discussed details of the shooting. Dr. Davis testified that he noted Singleton related a different version of the shooting to him than that given by Singleton to the police. In his opinion, the different versions indicated Singleton was not telling the truth.
Additionally, Dr. Davis read from his notes the words used by Singleton to describe the version of the incident related to Dr. Davis. The notes were read without objection from the defendant.
The defense cross-examined Dr. Davis about the interview, and, during cross-examination, ascertained that a tape of the interview was made. Dr. Davis stated the tape was in his possession at trial. A recess was allowed in order for the defense to review the tape. Following the recess, defense counsel further questioned Dr. Davis regarding statements made by the defendant on the tape. However, defense counsel did not ask for the tape of the interview to be played at this time.
On redirect examination the prosecutor requested, and the jury was allowed to hear, selected portions of the taped interview. The defendant argues that playing only the *490 selected sections, without playing the entire interview was reversible error.
On appeal, the state argues that the defendant waived his right to have the entire tape played because the defendant failed to request that it be played during the defense's cross-examination of Dr. Davis, and because, prior to the selected portions being played, the defense requested only one further selected portion to be played. The state also argues that the error was harmless because the portions of the tape played added nothing to Dr. Davis' testimony.
La. R.S. 15:450 provides that "Every confession, admission, or declaration sought to be used against anyone must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." Under certain circumstances, a defendant may waive the protective benefit of La.R.S. 15:450. State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651.
The defendant argues that State v. Haynes, 291 So.2d 771, 773 (La.1974) is applicable and requires reversal. In State v. Haynes, the Louisiana Supreme Court held at 773:
The deliberate attempt to use an excerpt from, rather than the entirety of, the defendant's prior admission or confession, in violation of La.R.S. 15:450, is reversible error. It is not harmless, aside from its essential unfairness, because it constitutes a substantial violation of a statutory right of the accused.
However, more recently the Louisiana Supreme Court in State v. Hart, supra considered whether it was reversible error for the trial judge's refusal to redact a portion of a confession. It held at 659:
This error, however, does not warrant reversal of Defendant's conviction and sentence, as it did not result in a fundamentally unfair trial.
Thus, the Louisiana Supreme Court has also applied a harmless error analysis. State v. Hart, supra at 659.
Nevertheless, we now determine whether the defendant waived the protection offered by La.R.S. 15:540. When the state attempted to play portions of the tape, defense counsel only sought to play another portion designated as "part 283." The state objected on the basis defense counsel had failed to play the designated portion during his cross examination of the witness. The trial judge denied defense counsel's request to play the portion. Now on appeal, defense counsel argues for the first time it was error for the trial judge to fail to order the entire tape be played. Under these circumstances we find the defendant has waived the protection offered by La.R.S.15:450.

MISTRIAL:
The defendant argues the trial court erred in denying his motion for a mistrial premised upon the state's explicit reference to the fact that the defendant was incarcerated at the time of trial.
During the state's cross-examination of the defendant's brother, the following colloquy took place:
Q. Did your brother tell you that he killed Leroy Woodard?
A. No, Sir.
Q: You never asked him?
A: No, Sir.
Q: Have you visited him in jail?
A: Yes, Sir.
Q: You never asked him?
A: Why would I ask a question like that in jail, sir?
Defense counsel requested a bench conference outside the presence of the jury. At that time defense counsel timely objected to the state's question regarding the defendant's incarceration. He requested a mistrial pursuant to La.Code Crim. P. Art. 770. He explained that an admonition would not correct the damage from the suggestion of guilt. The state argued below that the question made no reference to the defendant's current status, explaining that the jury was aware that at the time the defendant gave his confession he was in custody. The state argued an admonition would be sufficient.
The trial judge denied the motion for mistrial but agreed to admonish the jury. He *491 stated he viewed the question as "innocuous." The trial judge further stated:
... I will be glad to admonish the jury in that connection with the question by the state about whether or not his brother had seen the defendant while he was in jail, that they are to draw no conclusions from the fact that he was questioned about whether he'd seen his brother in jail or not.
If there is something other than that you want or if you want me to do that, you need to make that decision and tell me it. I'll be glad to do whatever you like.
Defense counsel then asked the trial judge to strike the question and answer on the basis of the form of the question rather than to admonish the jury. The trial judge agreed. Defense counsel objected to the form of the last question. The trial judge sustained the objection and asked the state to rephrase the question. The state then questioned appellant's brother without reference to incarceration.
The defendant analogizes this reference to the defendant's incarceration to a defendant's appearance for jury trial dressed in prison clothing, and argues that the reference, therefore, warranted the grant of a mistrial.
In State v. Campbell, 96-209 (La.App.3rd Cir. 11/6/96), 683 So.2d 1302, writ denied, 96-2864 (La.4/25/97), 692 So.2d 1081 the court considered this argument. In State v. Campbell, supra as well as in the instant case, the defendant refused an admonition and requested a mistrial. However, unlike the State v. Campbell case, the defendant did request other curative action. Here, the defendant sought to have the question stricken and the trial judge agreed.
The State v. Campbell court relied on the reasoning in State v. Johnson, 343 So.2d 155 (La.1977) and rejected the argument that the reference to incarceration was grounds for a mistrial. In State v. Johnson the trial judge had admonished the jury to disregard the comment.
Appellant suggests that the case of State v. Johnson is distinguishable. We disagree. The defendant argues that in State v. Johnson the court noted that the fact of the accused's present incarceration was an incident of trial from which the jurors could not be insulated, whereas in the instant case the fact of incarceration was not an incident of trial. The State v. Johnson court explained at 161:
...The remarks complained of in the instant case merely drew attention to a prominent fact of the trialthat defendant had been formally accused of the crime for which he was being tried. Although the fact of accusation may be suggestive of guilt to some jurors ... it is an incident of trial from which the jurors simply cannot be insulated. The court's admonition to the jury in this case, that it should not be prejudiced by the fact of defendant's incarceration, was the most that could be done to counteract any latent bias.
We find no merit to this argument and find State v. Campbell to be dispositive.

ERROR PATENT:
Our review of the record indicates one error patent. At the time of sentencing the trial judge did not inform the defendant of the prescriptive period for post-conviction relief mandated by La.Code Crim. P. Art. 930.8 C. Therefore, the trial court is directed to inform the defendant of the provisions of La.Code Crim. P. Art. 930 .8 by sending written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of these proceedings. State v. Kershaw, 94-141 (La.App. 5th Cir. 9/14/94), 643 So.2d 1289,1291.
Accordingly, for the reasons stated, we affirm the defendant's conviction and sentence. This case is remanded to the trial court for implementation of the required article 930.8 notice consistent with this opinion.
SENTENCE AND CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Don Singleton, Jr., the defendant's brother, testified that in the early morning hours of November 1, 1996, the date of the incident. Singleton called him expressing his fear of Woodard and the need to bring his daughter over to Don Singleton's house. Don Singleton testified that the defendant was at his home at approximately 1:20 a.m. on November 1, 1996, and that he was not wearing black at the time.
[2] See also La.Code Crim. P. Art. 841 which provides, in pertinent part, that "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence."